709 A.2d 1230

**PHILIP MORRIS INCORPORATED et al.**

v.

**Parris N. GLENDENING et al.**

**No. 10, Sept. Term, 1997.**

Court of Appeals of Maryland.

May 19, 1998.

---

John Henry Lewin, Jr. (Venable, Baetjer and Howard, L.L.P., on brief), Baltimore, for appellants.

Carmen M. Shepard, Deputy Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen.; John B. Howard, Jr., Asst. Atty. Gen., all on brief), Baltimore, for appellees.

Argued before BELL, C.J., ELDRIDGE, RODOWSKY, CHASANOW, RAKER and WILNER, JJ., and ROBERT L. KARWACKI, Judge (retired), Specially Assigned.

BELL, Chief Judge.

The sole issue before the Court is the legality of a contingency fee contract executed by the Attorney General of Maryland and a private law firm for the purpose of representing the State in a major tort litigation. We shall hold that the contract, which was authorized by the Governor and approved by the Board of Public Works, is valid.

## I.

On March 27, 1996, the Attorney General, after receiving authorization from the Governor, entered into a contingency fee contract (hereinafter, the "Contract") with a private law firm (hereinafter, "outside counsel") to "provide legal counsel, representation, and litigation services to the Attorney General and the State of Maryland in connection with litigation against the tobacco industry." ¶ 2.1. The Contract states that the Attorney General contracted with outside counsel for the following three (3) reasons:

"the State of Maryland ('the State') has incurred substantial costs over the years to pay for the health and other care of its citizens afflicted with tobacco-related illnesses; and

"the State has determined to seek the recovery of such costs and other damages arising from the sale and/or distribution of tobacco products from the tobacco industry through litigation; and

"the State lacks sufficient resources to pursue the recovery of such costs without entering into a contract with counsel pursuant to a contingency fee arrangement."[1]

¶ Preamble. Pursuant to the Contract, the "Attorney General shall have the authority to control all aspects of [outside counsel's] handling of the litigation ... [and][s]uch authority

---

**1.** According to the Governor's November 16, 1995 Press Release, which was disseminated on even date as the Attorney General's "Request for Proposals for Private Counsel to Assist in Representing the State in Major Litigation," one of the stated purposes for retaining outside counsel was to minimize the State's commitment of personnel and financial resources to the lawsuit.

shall be final, sole and unreviewable." *Id.*[2] Outside counsel's responsibilities are also enumerated in the Contract as follows:

"A. Coordinate closely with the Attorney General regarding all aspects of this Contract and the legal remedies authorized thereby;

"B. Represent the State in any lawsuits filed to: (a) recover federal and State medical assistance payments paid or to be paid under both the federal Medicaid Program and the now discontinued State-only Medical Assistance Program (collectively, 'Medicaid Payments'), and in addition, any other types of expenditures made by or on behalf of the State for tobacco related illnesses, including health insurance coverage for State employees. The recovery sought under this Contract will be for medical services rendered or to be rendered to Medicaid recipients and other State employees with tobacco related illnesses. Recovery for additional ancillary expenditures may also be sought as part of the litigation; and (b) recover damages or other monies pursuant to consumer protection, common law fraud, or any other legal theories relating to tobacco-related damages. This representation responsibility shall include acting on behalf of the State in all legal and administrative matters, including all levels of appeal, arising out of or in conjunction with the [t]obacco [l]itigation.

"C. Initially bear and be solely responsible for all expenses (filing, legal, expert witness and otherwise) and all other costs of the [t]obacco [l]itigation, subject to reimburse-

---

**2.** Paragraph 16 of the Contract provides that "th[e] Attorney General may terminate th[e] Contract and all matters related to it, in whole or in part, at any time." It further provides, however, that:

"[i]f the Attorney General terminates th[e] Contract for the convenience of the State, rather than for default, [outside counsel] then shall be entitled to reimbursement of its expenses of the [t]obacco [l]itigation, subject to applicable law. Following any termination for convenience, should the State obtain a recovery relying in whole or in part upon work by [outside counsel], [outside counsel] shall be entitled to receive reasonable fees, but in an amount not to exceed 25% of the recovery, subject applicable law."

¶ 16.

ment only in the event of a recovery, and to any limitations imposed by law or the rules of the Maryland Bar, which are the subject of this Contract, and for all employee salaries and all nature of office expenses incurred by or on behalf of [outside counsel].

"D. Provide copies to the Attorney General of all correspondence received or sent out, all legal pleadings filed or received, and shall in all other appropriate ways keep the Attorney General aware of the status of any lawsuits brought pursuant to this Contract;

"E. Shall, in the event of a successful recovery, prepare and provide a final accounting at the conclusion of all related legal proceedings, including all appeals, in the manner and form required by the Attorney General;

"F. Perform all legal services necessary, as determined by the Attorney General, to successfully litigate on behalf of the State, its claims against the tobacco industry;

"G. Use its best efforts to obtain all relevant discovery materials from existing and future tobacco litigation, and work with other law firms and attorneys cooperatively to achieve such goals; and

"H. Subject to the overall direction and supervision of responsible State government officials, retain and supervise all manpower necessary to permit this litigation to proceed without significantly impairing the ability of the involved State agencies to meet their ongoing governmental obligations. In this regard, [outside counsel] will retain at its sole expense sufficient manpower (including, but not limited to, clerical, data management, paralegals, software and data processing consultant) to meet the overall needs of the [t]obacco [l]itigation."

¶ 2.1 A through H. The State, through the Department of Health and Mental Hygiene, is obligated to appoint one fulltime administrative staff person to work with outside counsel as project coordinator. ¶ 2.1 I.

According to the Contract, compensation of outside counsel is contingent upon the State's recovery; outside counsel will

receive compensation if and only if a money judgment is obtained as a result of the tobacco litigation. With respect to the fee, the Contract provides that outside counsel "will be paid a fee of 25% of the recovered funds plus the reasonable expenses of litigation incurred." ¶ 3.1. If no damages are recovered, the Attorney General and the State will owe nothing to outside counsel. ¶ 3.2. In the event of the recovery of damages, the Contract provides for the method of payment. That provision requires outside counsel to proceed as follows:

"A.  Hold any monies received as a result of any settlement, legal final judgment, or as a bond, in an interest bearing account in a financial institution acceptable to the State ... and in a joint account bearing the names of both [outside] counsel and the State as account-holders. It is further understood and agreed that contingency fee payments and percentages shall be computed solely on the basis of the total amount of monies actually recovered and transmitted together with all accrued interest;

"B.  Within thirty (30) days of the earliest legally permissible date, release and transmit any and all monies recovered to the State to the Attorney General, net of costs and fees allowed under this Contract as determined by the Attorney General, pursuant to his instructions, including interest accrued thereon; and

"C.  Shall prepare and submit to the Attorney General an itemized computation of the contingency fee and expenses, in a manner and form acceptable to the State auditors, in advance of the payment referred to in paragraph B above."

¶ 3.3.  Hence, after outside counsel collects 25% of the gross judgment amount, in addition to reasonable attorneys' expenses, the remaining amount, 75% of the gross recovery less attorneys' expenses, is the State's collection,[3] which is trans-

---

**3.** According to federal law governing states' recovery of medicaid funds, the State's collection may be distributed as follows:

"(a) To itself, an amount equal to State Medicaid expenditures for the individual on whose right the collection was based.

mitted to the Attorney General, who, by law, must deposit the collected funds into the State Treasury.

All terms and provisions of the Contract were negotiated and agreed to by the Attorney General and outside counsel. In addition, members of the Board of Public Works, namely, the Governor, Treasurer and Comptroller, also approved and signed the Contract.

## II.

On January 22, 1996, in the Circuit Court for Talbot County, several tobacco manufacturers and tobacco-related companies, (hereinafter, the "appellants"),[4] filed an action for declaratory and injunctive relief against Governor Parris N. Glendening, Attorney General J. Joseph Curran, Jr. and Secretary of the Department of Health and Mental Hygiene, Martin P. Wasserman, (hereinafter, collectively, the "appellees"), challenging the legality of the Contract.[5] Soon thereafter, the parties filed

---

"(b) To the Federal Government, the share of the State Medicaid expenditures, minus any incentive payment. . . .
"(c) To the recipient, any remaining amount."
Third Party Liability, Cooperative Agreements and Incentive Payments, 42 C.F.R. § 433.154 (1997).

4. The named plaintiffs, the appellants here, include: Philip Morris Incorporated, Brown & Williamson Tobacco Corporation, Liggett Group, Inc., Lorillard Tobacco Company, R.J. Reynolds Tobacco Company, The Tobacco Institute, Inc., and Richardson's County Store, L.L.C.

5. Similar Contingent fee contracts have been challenged in other jurisdictions. *Compare e.g. City of San Francisco v. Philip Morris Incorporated*, 957 F.Supp. 1130, 1135 (N.D. Cal.1997) (denying defendants' motion to disqualify contingent fee counsel) *with McGraw v. American Tobacco Company*, Civ. A. No. 94–C–1707 (W.Va. Cir. Ct. Nov. 29, 1995) (contingent fee arrangement was an unlawful appropriation of State funds and Attorney General had no statutory or constitutional authority to retain such counsel). *See also State of Minnesota v. Philip Morris Incorporated*, No. C1–94–8565 (D. Ct. Minn. Dec. 2, 1994) (Minnesota Constitution provides the Attorney General broad authority to retain contingent fee counsel); *Philip Morris Incorporated v. Graham*, Case No. 960904948 (D. Ct. Utah Feb. 13, 1997) (Utah statutory scheme allows contingent fee contract); *Philip Morris Incorporated v. State of New Jersey*, Nos. L 11480–96, C 254–96 (N.J.Super. Ct. March 4, 1997) (New Jersey statutory scheme allows contingent fee contract).

cross motions for summary judgment. The appellants contended that the Contract, which authorizes outside counsel to institute and prosecute an action on behalf of the State primarily against tobacco manufacturers for reimbursement of public funds expended to provide health care for tobacco-related illnesses,[6] is invalid because the Attorney General

---

6. On May 1, 1996, the Attorney General and outside counsel, on behalf of the State of Maryland, filed a thirteen count complaint in the Circuit Court for Baltimore City against several tobacco manufacturers and tobacco-related companies, most of whom are appellants in the case *sub judice*, alleging, *inter alia*, consumer protection and antitrust violations, unjust enrichment, fraud, breach of warranty, negligence, strict liability, and conspiracy. *State of Maryland v. Philip Morris Incorporated*, Case No. 96122017/CL211487. The complaint alleges that the State has paid three billion dollars in medical assistance for tobacco-related health care costs. This suit is similar to civil suits filed by the Attorneys General of 39 states and Puerto Rico and several local governments. Cases brought in Mississippi, Florida, Texas and Minnesota have settled. Efforts to reach a national settlement have been, ostensibly, terminated.

*The 90 Day Report: A Review of Legislation in the 1998 Session*, Volume 1, prepared by the Department of Legislative Services, provides the following synopsis of judicial and legislative activities since the State filed its complaint:

"On May 21, 1997, the Circuit Court for Baltimore City dismissed all of the State's common law claims, holding that the remedy of subrogation is the exclusive remedy available to the State in seeking to recover reimbursement for funds expended through the Medicaid Program for the smoking-related illnesses of Program recipients. [*See State v. Philip Morris, Inc.*, 1997 WL 540913 (Md.Cir.Ct. May 21, 1997).]

"In effect overturning the Baltimore City Circuit Court ruling, **Senate Bill 652** clarifies that any action brought under the Medical Assistance Program (Medicaid) subrogation statute is not exclusive and is independent of and in addition to any right, remedy, or cause of action available to the State or any State agency or individual. This provision of the bill is not limited to suits against tobacco manufacturers, but the clarification allows the State to maintain a direct cause of action against the tobacco manufacturers, rather than relying on a subrogation claim in which the State would "stand in the shoes" of individual smokers against whom the tobacco manufacturers could raise the defense of contributory negligence and assumption of risk.

"The bill further establish that in a State action against a tobacco manufacturer, causation of the amount of Medicaid expenditures attributable to the use of a tobacco product may be proved or disproved by evidence of statistical analysis. Proof of the causation

lacks constitutional or statutory authority to compensate outside counsel on a contingent fee basis. Specifically, they argued that, because the underlying tobacco litigation sought reimbursement for the expenditure of "public funds," any recovery would constitute "State funds," *in toto* and, as such, expenditures thereof must be authorized by a specific legislative appropriation. There has not been any such appropriation enacted by the General Assembly in this case, they pointed out. The appellants further argued that the Contract violates due process and public policy because it provides outside counsel with an improper financial stake in the outcome of the underlying litigation potentially, four billion dollars, 25% of the sixteen billion dollars recovery sought.

The appellees countered, arguing that the Attorney General, with the Governor's permission, has the constitutional and statutory authority to retain outside counsel on a contingent fee basis, in order to pursue a suit of significant public interest on behalf of the State. Furthermore, the appellees maintained, the contingency fee contract does not violate the appellants' due process rights because the Attorney General, the state official with the "final, sole and unreviewable" authority to control all aspects of the litigation, has no personal or pecuniary interest in the outcome of the litigation.

---

or the amount of expenditures for particular individuals is not needed."

\* \* \* \*

"[Senate Bill] also contains a provision stating that [outside counsel] and the Attorney General agree that the contract between those parties for the provision of legal services in connection with the State's litigation against the tobacco industry, dated March 27, 1996, be modified to reduce the fee for legal services from 25% to 12.5% of any funds recovered. The bill also expressly states that it does not prohibit or limit the application of Rule 1.5 of the Maryland Lawyers' Rules of Professional Conduct, which requires legal fees to be reasonable and sets forth several factors to be considered in determining the reasonableness of a fee.

"Finally, the bill contains a statement of intent of the General Assembly that a portion of any recovery that the State may receive in the State's suit against tobacco manufacturers be allocated to a program to be established to offset any loses suffered by Maryland tobacco farmers."

*Id.* at F–4, 5.

Unpersuaded by the appellants' arguments, the circuit court first found that, pursuant to Maryland Code (1984, 1995 Repl.Vol., 1997 Supp.) section 6–105(b) of the State Government Article, the underlying tobacco litigation was "extraordinary." It explained:

> "Under the circumstances of the case at bar, the court is satisfied that the underlying lawsuit is 'extraordinary' within the meaning of the term in Section 6–105(b). The State seeks, *inter alia*, billions of dollars in compensation for its costs of providing medical assistance, including Medicaid benefits, to Maryland residents who are suffering from alleged tobacco-related illnesses. Furthermore, Defendants face unusually wealthy and powerful opponents. For these reasons, the underlying litigation qualifies as 'extraordinary.' "

The trial court then analyzed the language and context of section 6–105(b) and found that the plain language of subsection (b)(2)(ii) did not place any limitation on the source of the funds from which the Attorney General may compensate outside counsel. Consequently, the court "decline[d] to read the provision to bar affirmatively the Attorney General from entering into a contingent-fee contract with private counsel. To so construe an unambiguous provision, would be to adopt an overly rigid interpretation that would limit unreasonably the scope of its operation." Regarding the appellants' due process argument, the trial court simply was "not convinced . . . that [outside] counsel's financial incentive to prevail in the underlying [tobacco] litigation is incongruous with the obligation to do justice." The court reasoned, "Although the Attorney General probably will not direct each aspect of the daily handling of the lawsuit and will ask contingent-fee counsel for advice concerning litigation strategy, counsel plainly will not enjoy boundless discretion in his pursuit of the litigation." Accordingly, the trial court denied the appellants' motion for summary judgment and entered judgment in favor of the appellees.

The appellants timely filed a Notice of Appeal to the Court of Specials Appeal. On our own motion, and before the

intermediate appellate court considered the matter, we issued a writ of *certiorari*. In this Court, the appellants, asserting essentially the same points they argued below, make the following two contentions:

> "*First*, any money that the State might recover in the [tobacco] litigation would be *State* funds, which must by law be deposited *in their entirety* in the State Treasury. Once such funds are deposited in the State Treasury, they may only be withdrawn or disbursed by means of an appropriation by the General Assembly. The Contingent Fee Contract flatly contradicts these basic constitutional and statutory requirements by committing the State to pay twenty-five percent of any funds recovered however large that amount may be directly to private counsel, without any appropriation by the General Assembly. *Second*, the Contingent Fee Contract violates due process and public policy by giving counsel for the State a massive personal stake in the Reimbursement Litigation, creating both the appearance and the reality of bias and corrupting the fair and impartial administration of justice by the State."

(emphasis in original).

## III.

### (a)

The appellants argue that the Contract is illegal because "[a]ny recovery in the [underlying tobacco] [l]itigation would constitute *in its entirety* State funds," which must be deposited in the State Treasury and may only be withdrawn or disbursed by legislative appropriation. (emphasis in original). In support of that argument, the appellants first maintain, citing *Baylin v. United States*, 43 F.3d 1451 (Fed.Cir.1995), that the client, not the attorney, "retains ownership interest in the entire recovery, including the contingency fee portion."[7] Hence, they posit, "it is the State and *not* its attorneys which owns and retains all rights to any recovery in the [tobacco]

---

7. Maryland courts have not had occasion to consider this issue.

[l]itigation." (emphasis added). This is true, the appellants assert, "even though ... the State argues that it may never actually take possession of the contingent fee portion of the recovery, and even though ... the State has assigned a portion of its potential recovery to [outside counsel] prior to knowing if and how much it may recover."

The appellants further argue that the contingency fee arrangement provided in the Contract constitutes an unlawful appropriation of State funds, as both the constitutionally- and statutorily-based budgetary laws of Maryland require all monies collected on behalf of the State to be deposited in the Treasury. They point to Article VI, Section 3 of the Maryland Constitution, which states that "[t]he Treasurer shall receive the moneys of the State, and until otherwise prescribed by law, deposit them, as soon as received, to the credit of the State," and to Maryland Code (1985, 1995 Repl.Vol.) section 6–213(a) of the State Finance & Procurement Article, which similarly states that, "[e]xcept as otherwise provided by law, each unit of the State government monthly shall: (1) pay into the State Treasury all collections, fees, income, and other revenues that are received by the unit; [and] (2) account to the Comptroller for those revenues." In addition, the appellants argue that Maryland law prohibits State officials from disbursing or obligating State funds without an appropriation, a distinctly legislative act. *See* Md. Const. Art. III, § 32 ("No money shall be drawn from the Treasury of the State, by any order or resolution, nor except in accordance with an appropriation by Law."); Md.Code (1985, 1995 Repl.Vol., 1997 Supp.) § 7–205 of the State Fin. & . Proc. Article ("Money may be disbursed from the State Treasury only in accordance with the current appropriation for a program. . . .").

The appellants also argue that the Contract violates section 7–234 of the State Finance and Procurement Article, which provides that "[a]n officer or unit of the State government may not spend money: (1) in excess of the total appropriation to the officer or unit; or (2) in excess of the amounts set forth in the current schedule for apportionment and disbursement of the appropriation." The appellants reason that section 7–

234 has been violated because "[u]nder the terms of the Contingent Fee Contract, as soon as the State began receiving services from [outside counsel], it became obligated to pay that firm twenty-five percent of any amount ultimately recovered in the [tobacco litigation]." The Contract, they postulate, effectively ties the hands of the General Assembly and the Governor, by committing the State to spend money before there has been an appropriation. Quoting an Opinion of the Attorney General, the appellants assert that " § 7–234 is intended to prevent such a diminution of the Governor's discretion about resource allocation." Md. Op. Att'y Gen. No. 91–049, 1991 WL 626536 at 4 (Nov. 12, 1991).[8]

In response to the appellants' arguments, the appellees contend, as the trial court found below, that a proper analysis of this case begins with the authority of the Office of the Attorney General, not with the constitutional and statutory laws governing fiscal policies. They argue that the Attorney General has clear constitutional and statutory authority to employ outside counsel in the capacity of an "assistant counsel" in extraordinary cases such as the underlying tobacco litigation. They assert that "[t]he Attorney General, acting at the Governor's direction, plainly has the constitutional power under Article V, Section 3, of the Maryland Constitution, to initiate a civil suit in the interest of the State." Further, section 6–105 of the State Government Article "provides the Attorney General with substantial flexibility in determining how ... special assistant counsel may be compensated, and conditions the Attorney General's exercise of his authority only on the approval of the Governor." They add, "Nothing in section 6–105(b) suggests or implies that a contingent fee arrangement could not constitute 'proper compensation' within the meaning of the statute." Next, the appellees contend that there is no requirement that the gross recovery from the

---

**8.** This argument is clearly a red–herring because, if section 7–234, as the appellants argue, is intended to prevent the "diminution of the Governor's discretion about resource allocation," the appellants cannot also argue that the instant contingency fee contract, which was approved by the Governor, limits the Governor's discretion.

tobacco litigation must be first deposited in the State Treasury and then, pursuant to specific appropriation, withdrawn to compensate outside counsel. Such a requirement, they argue, "would thus call into question the State's ability to engage outside bond counsel, as well as other situations where the State retains and pays outside counsel." Finally, the appellees argue, "assuming that . . . the State already 'owns' the funds that would ultimately be used to pay [outside counsel], there is no question that the Board of Public Works can approve an agreement disposing of that 'property of the State' as long as the State receives adequate consideration."

### (b)

In Maryland, contingency fee agreements are commonplace in the practice of law, and, generally, are not illegal or viewed with a jaundiced eye. *See* Md. Rule of Prof. Conduct 1.5(c) and (d) (contingent fees are permissible, except in domestic and criminal defense cases).[9] Therefore, in determining whether the subject contingency fee arrangement between the Attorney General and outside counsel is valid, we, as the court below observed, "first must examine the sources of the Attorney General's powers" to enter into such an arrangement.

In 1984, in *State v. Burning Tree Club*, 301 Md. 9, 481 A.2d 785 (1984), we chronicled the constitutional provisions relative to the Attorney General and concluded that the Attorney General "possesses no common law powers." *Id.* at 33, 481 A.2d at 797; *see also Murphy v. Yates*, 276 Md. 475, 480–84, 348 A.2d 837, 840–42 (1975). Rather, "the Attorney General of Maryland has only such powers as are vested in him by the Constitution of Maryland and the various enactments of the General Assembly of Maryland." *Burning Tree Club*, 301 Md.

---

9. The comment to Rule 1.5 of the Rules of Professional Conduct defines a contingent fee arrangement as follows:

"an agreement for legal services (1) made before the services are completed, and (2) providing compensation of the lawyer which is contingent in whole or in part upon the successful accomplishment or disposition of the legal matter and which is either in a fixed amount or in an amount determined under a specified formula."

at 32, 481 A.2d at 797. Article V, Section 3 of the Maryland Constitution, for example, provides, in pertinent part, that the Attorney General shall:

"(2) Investigate, commence, and prosecute or defend any civil or criminal suit or action or category of such suits or actions in any of the Federal Courts or in any Court of the State, or before administrative agencies and quasi legislative bodies, on the part of the State or in which the State may be interested, which the General Assembly by law or joint resolution, or the Governor shall have directed or shall direct to be investigated, commenced, and prosecuted or defended."

Md.Code (1912, 1981 Repl.Vol., 1997 Supp.) Const. Art. V, § 3(a)(2); *see also In re Special Investigation No. 244*, 296 Md. 80, 87, 459 A.2d 1111 (1983). That section also provides that "[t]he Attorney General shall have and perform any other duties and possess any other powers, and appoint the number of deputies or assistants, as the General Assembly from time to time may prescribe by law." *Id.* at § 3(b). One such law, which the appellees contend the Attorney General relied upon in the instant case, is section 6–105(b) of the State Government Article. That section explicitly sets forth the terms and conditions under which the Attorney General may retain a private attorney as an "assistant counsel." Section 6–105 (b) provides:

"(b) *Special employment.* (1) In addition to any other staff appointed under this section, the Attorney General, with the written approval of the Governor, may employ any assistant counsel that the Attorney General considers necessary to carry out any duty of the Office in an extraordinary or unforeseen case or in special county work.

"(2) The Attorney General shall submit to the Governor a written request that:

"(i) states the necessity of and each reason for the special employment; and

"(ii) states the proposed compensation and its source or certifies that the Attorney General cannot ascertain in advance the proper compensation.

"(3) Compensation that cannot be ascertained in advance may be agreed on or adjusted later."

Md.Code (1984, 1995 Repl.Vol., 1997 Supp.) § 6–105 of the State Gov. Article. This statutory provision has been neither significantly changed by the Legislature nor interpreted by this Court since its enactment in 1916. *See* Md.Code (1957 Vol.), Article 32A, § 11; 1916 Maryland Laws, ch. 560, § 9.[10] Needless to say, however, section 6–105(b) clearly authorizes the Attorney General to retain outside counsel, and, more important, establishes requirements (1) the Attorney General's determination that the case is an extraordinary, unforeseen or a special county work case, (2) the Attorney General's written request, and (3) the Governor's approval that must be satisfied before the Attorney General may enter into a "special employment" agreement.

In the instant case, the Attorney General determined, and the Governor, along with other members of the Board of Public Works, agreed that the tobacco litigation was "extraordinary," as it was "prohibitively expensive" for the State to finance a lawsuit seeking billions of dollars from "unusually wealthy and powerful opponents." Furthermore, the Attorney General determined that handling the tobacco litigation would

---

**10.** Section 9 of the 1916 law provides:

"[T]th Attorney–General, upon written request to the Governor approved in writing by the Governor, may from time to time, employ such additional assistant counsel as, in his judgment, may be necessary, in connection with the performance of the duties of his Department in extraordinary or unforeseen cases, or in special local County work. No such additional assistant shall be employed unless the written request from the Attorney–General to the Governor therefor shall state the necessity and reasons for such special employment, the compensation to be paid, and the source or fund from which the same is to paid. If in any case the Attorney–General cannot ascertain in advance the proper compensation to be paid for such services, he shall so certify to the Governor, and in such case the compensation may be left for future agreement or adjustment."

1916 Maryland Laws, ch. 560, § 9.

undoubtedly require a significant commitment of State personnel and financial resources from the Office of the Attorney General and other departments of State government. The enormity of the tobacco litigation is evident from the thirteen-count complaint the State filed against fourteen tobacco manufacturer and tobacco-related companies, alleging various violations of the Maryland Consumer Protection and Antitrust Acts and numerous tort claims.[11]

---

**11.** The Complaint alleges the appellants committed a "host of fraudulent and unlawful acts," including:

"Publicly undertaking, as a paramount special responsibility, the duty of researching and disclosing to public health authorities and the public the full extent of the health risks of cigarette smoking, then setting about to do everything in their power to subvert real scientific research, including suppressing, concealing, distorting, and lying about the state of their knowledge of those risks;

"Creating and funding fraudulent organizations as 'fronts' (so described by the tobacco companies), such as the Tobacco Industry Research Council (later the Council for Tobacco Research), which was held out to the public as an independent research organization, but which was in fact secretly controlled by lawyers and public relations firms, to prevent the public from learning what Defendants knew about the health risks of smoking:

"Secretly destroying, concealing, and shipping overseas incriminating evidence of industry testing and research on the health risks of cigarette smoking and the addictive nature of nicotine, shutting down laboratories overnight and making personal threats against scientists who tried to publish research revealing what the industry knew, and asserting bogus claims of attorney–client privilege and work product to conceal their scientific research;

"Engaging in unfair and deceptive trade practices by, among other things, jointly sponsoring false, deceptive, and misleading advertising and public relations campaigns intended to confuse and create doubt among governmental entities and the public about the health risks of cigarette smoking;

"Jointly and collectively making false and misleading representation to Congress, other governmental entities, and the public regarding the health risks of cigarette smoking, the addictive nature of nicotine, and the manipulation of nicotine levels in cigarettes, with the intent to defraud, and knowing that the State and others would reasonably rely on their representations;

"Conspiring to use monopoly power, and using that power, to suppress research, development, marketing, and sales of 'safer' cigarettes; and

"Engaging in unfair trade practices by targeting marketing and advertising efforts to promote illegal sales of cigarettes to minors, and

In this case, we will not review and, therefore, not disturb the Attorney General's and the Governor's determination of extraordinariness, which, pursuant to section 6–105(b), was a decision within their discretionary authority. *See United States v. George S. Bush & Co., Inc.*, 310 U.S. 371, 380, 60 S.Ct. 944, 946, 84 L.Ed. 1259 (1940) ("It has long been held that where [the Legislature] has authorized a public officer to take some specified legislative action when in his judgment that action is necessary or appropriate to carry out the policy of [the Legislature], the judgment of the officer as to the existence of facts calling for that action is not subject to review."); *Judy v. Schaefer*, 331 Md. 239, 265–266, 627 A.2d 1039, 1052–53 (1993) (Governor's determination that certain budgetary expenditures were "unnecessary" is not subject to judicial review because a statute provided him with such discretionary authority); *Hamilton v. Verdow*, 287 Md. 544, 556, 414 A.2d 914, 921 (1980) ("[P]rinciples behind the constitutional separation of powers … place limits on a court's power to review or interfere with the conclusions, acts or decisions of a coordinate branch of government made within its own sphere of authority.") (citing *Dep't of Nat. Res. v. Linchester*, 274 Md. 211, 218, 223–225, 334 A.2d 514 (1975) (footnote omitted).) As Justice Story of the United States Supreme Court stated long ago in *Martin v. Mott*, 12 Wheat. 19, 31–32, 6 L.Ed. 537 (1827):

> "Whenever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is sound rule of construction that, the statute constitutes him sole and exclusive judge of the existence of those facts."

*See Adams v. Nagle*, 303 U.S. 532, 542, 58 S.Ct. 687, 693, 82 L.Ed. 999 (1938); *Culp v. Com'rs of Chestertown*, 154 Md. 620, 623, 141 A. 410 (1928); *Norris v. Baltimore*, 172 Md. 667, 686, 192 A. 531 (1937); *Gebhart v. Hill*, 189 Md. 135, 139, 54 A.2d

---

developing products and deceptive advertising campaigns designed to appeal to African–Americans and women."

315 (1947); *First Continental v. Director*, 229 Md. 293, 302, 183 A.2d 347 (1962).

■ The procedural requirements set forth in section 6–105(b) were also followed by the Attorney General. On March 20, 1996, the Attorney General submitted a written request to the Governor, seeking authorization "to retain outside counsel to assist the State in seeking the recovery of significant State costs from the tobacco industry." In compliance with the statute, the Attorney General explained that the tobacco litigation "will be prolonged and expensive, and the most-effective means of advancing the State's interest is by hiring outside counsel on a contingency basis." He further explained that "[f]unding for the payment of tobacco counsel services will be obtained from the proceeds of any recovery to the State." The Governor subsequently approved the request, and thus, pursuant to the dictates of section 6–105(b), the Attorney General certainly was authorized to retain outside "assistant counsel" in connection with the tobacco litigation. *See In re Special Investigation No. 244*, 296 Md. at 87–88, 459 A.2d at 1114–15 (Attorney General was fully vested with the power to pursue investigation of medicaid fraud pursuant to authorization in series of letters from Governor); *Bomhardt v. State*, 71 Md.App. 609, 612–14, 526 A.2d 983, 984–86, *cert. denied*, 311 Md. 144, 532 A.2d 1371, *appeal dismissed*, 485 U.S. 950, 108 S.Ct. 1208, 99 L.Ed.2d 410 (1987) (Governor could grant Attorney General authority to investigate and prosecute offense of failing to file state income tax returns.).

■ Whether section 6–105(b) permits the Attorney General and outside counsel to enter into a contingent fee arrangement with outside counsel, which, the appellants contend, amounts to an unauthorized expenditure of unappropriated State funds, is not as clear, however.[12] By its terms, section

---

12. In 1989, the opinion of the Attorney General's Office was requested on the following question:

"Is there sufficient authority under law in Maryland for the Attorney General or for some other authority at the State or county level to retain private counsel for debt collection purposes, including litiga-

6–105 clearly does not prohibit contingency fee contracts. In fact, section 6–105(b) is a rather procedurally rigid statute, and the only matter covered by it which is subject to the Attorney General's discretion is the proper compensation of assistant counsel. The appellants, however, argue that any interpretation of section 6–105(b) which authorizes the Attorney General to compensate outside counsel on a contingency basis conflicts with both Article III, Section 32 of the Maryland Constitution, which "expressly prohibits the Attorney General, and other State officials and agencies, from spending

---

tion, with payment to be made from dollars recovered or is legislation needed?"

74 Md. Op. Att'y Gen. 136 (1989).

The Attorney General observed that a contingent arrangement, "in effect, contracts away a share of the claimed sum in exchange for the attorney's services." *Id.* at 140. Relying on previously published opinions, the Attorney General also observed that because "[a] debt to the State is a species of State property," *id.* (citing 62 Md. Op. Atty. Gen. 743, 745 (1977); 45 Md. Op. Atty. Gen. 107 (1960)), "[i]f a State official were to contract to pay a portion of that debt to a private lawyer, arguably the official would be 'dispos[ing] of property' within the meaning of SF 10–105(a), which gives that power to the Board of Public Works." *Id.* at 140–41. Reviewing section 6–105(b), the Attorney General opined:

"The portions of . . . subsection [16–105(b)] that deal with compensation contemplate that the amount of an outside lawyer's fee ordinarily is to be fixed in advance. SG § 6–105(b)(2)(ii). A typical contract would agree to pay the lawyer a specified sum per hour. 'Compensation that cannot be ascertained in advance,' however, 'may be agreed on or adjusted later.' SG § 6–105(b)(3). No specific mention is made of contingent fees, which leave the dollar amount uncertain although they entail a specific contractual agreement that the State will accept some percentage less than the full amount of its recovery.

"This provision falls short of providing sufficient authority for the Attorney General to contract away a portion of property asserted to belong to the State. Under current law, we conclude, a contract between the Attorney General and a private lawyer for a contingent fee will have to be approved by the Board of Public Work under SF §10–305(a)."

*Id.* at 141–42.

On this appeal, the appellants surprisingly do not take issue with the Attorney General's reasoning in 74 Md. Op. Att'y Gen. 136 (1989). The State, however, argues that, although the Attorney General obtained (probably as a precautionary measure) the approval of the Board of Public Works, "section 6–105, read in its entirety strongly implies that

any State funds here any moneys recovered in the [tobacco] litigation without an appropriation," and section 6–213 of the Finance and Procurement Article which establishes that "[t]he Attorney General has a clear statutory obligation to deposit the entire recovery within a month of its receipt with the Treasury."

We find that the language of section 6–105(b) permits the Attorney General to enter into a contingency fee contract.[13]  Section 6–105(b) does not conflict with Article III, Section 32 of the Constitution, which pertains to "an appropriation" and to money "drawn from the Treasury," not money that has yet to be deposited into the State Treasury.  As the trial court observed, citing *Bayne v. Secretary of State*, 283 Md. 560, 570, 392 A.2d 67, 72 (1978), "an 'appropriation' constitutes an authorization to withdraw *from the Treasury*." As we explained in *Dorsey v. Petrott*, 178 Md. 230, 13 A.2d 630 (1940):

"an appropriation of public funds is made by a constitutional mandate or a lawful legislative act whose primary object is to authorize the withdrawal from the state treasury of a certain sum for a specified public object or purpose to which such sum is applied."

*Id.* at 245, 13 A.2d at 637–38.  *See also Kelly v. Marylanders for Sports Sanity Inc.*, 310 Md. 437, 458–59, 530 A.2d 245, 255–56 (1987).

As for section 6–213, it provides:

"(a) *Monthly accounting.*  Except as otherwise provided by law, each unit of the State government monthly shall:

"(1) pay into the State Treasury *all collections, fees, income, and other revenues that are received by the unit.*"

---

Board of Public Works approval would *not* have been necessary" to hire outside counsel. (emphasis added).

**13.**  We expressly reserve the issue of whether section 6–105(b) provides sufficient authority for the Attorney General to enter into a contingency fee contract without the express approval of the Board of Public Works. Needless to say, here, the written approval of the Board was sought and obtained.

(emphasis supplied).  The gross settlement or judgment recovered from the tobacco litigation does not constitute "collections, fees, incomes, [or] other revenues" that must be deposited into the State Treasury.  According to the Contract, recovered funds will not be "collected" by the State until outside counsel receives his contingency fee and is compensated his expenses from the gross recovery.  *See* Contract ¶ 3.3. The Contract provides that the gross recovery of the tobacco litigation will be deposited into a "joint account bearing the names of both [outside counsel] and the State as accountholders."  Contract, ¶ 3.3(A).  At that time, outside counsel will receive his contingency fee 25% of the gross recovery and will also be compensated reasonable expenses.  After this occurrence or within 30 days of receipt of the funds, "all monies recovered to the State, net costs and fees" will be transmitted to the Attorney General, who will collect and deposit the funds on behalf of the State.  Once the net recovery is collected and deposited into the State Treasury, it thus becomes State funds subject to legislative appropriation, pursuant to Article III, Section 32, which provides that "[n]o money shall be *drawn from the Treasury* of the State . . . except in accordance with an appropriation by Law." (emphasis supplied).  Thus, the gross recovery from the tobacco litigation is not "State" or "public" money subject to legislative appropriation until the State has fulfilled its obligation under the Contract, collected the recovery, net of the contingency fee and litigation expenses, and deposited the funds into the State Treasury.  Compare *Meredith v. Ieyoub*, 700 So.2d 478, 484–88 (La.1997), where a divided Supreme Court of Louisiana held invalid a contingency fee contract executed between the Attorney General and private attorneys to represent the State in environmental law enforcement actions. The statute governing recoveries from environment protection actions provided: "All sums recovered through judgment, settlements, assessment of civil or criminal penalties [and] funds recovered by suit or settlement . . . shall be paid into the state treasury."  *Id.* 700 So.2d at 482.  It was on this

basis that the statute was "clear and unambiguous" and that the majority reached the result it did.

Dissenting, Chief Justice Calogero wrote: "I believe that in this case, a reasonable interpretation of the sum 'recovered' by the client ... is the amount of the judgment or settlement less the contingency fee, just as the amount of property taxes recovered by a sheriff is the amount collected less the commissions." *Id.* at 485. Similarly, another dissenting judge, Judge Lemmon, noted:

> "While plaintiffs argue that only the Legislature has the power to dispose of property belonging to the state, a disputed legal claim is a unique type of property in that its value can only be realized through a legal settlement or litigation. Once the value of the state's disputed claims is realized through settlement or judgment, the money or property ultimately recovered for the state by its constitutionally authorized officer, after deduction of the costs of recovery, is the property that the Legislature has the exclusive power to dispose of."

*Id.* at 488 (footnote omitted). Judge Johnson also dissented from the majority's opinion, however, without a written opinion.

Although section 6–105(b) does not specifically state that the Attorney General may enter into a "contingency fee contract," by its terms "[c]ompensation that cannot be ascertained in advance may be agreed on or adjusted later" there is a strong indication that the Legislature did not intend to impose strict conditions under which assistant counsel may be specially employed.[14] Rather, the Legislature sought to provide the Attorney General with, and indeed achieved, a reasonable degree of flexibility in determining when and how special assistant counsel ought to be employed and paid, subject to

---

**14.** *Adoption of the appellants' position would not only unduly limit the ability of all units of the State to contract with private attorneys for legal services without prior legislative appropriation, but it would also prohibit the State from settling a lawsuit for less money than was originally sought. For certain, this is not the intended consequence of Maryland's budgetary scheme.*

the Governor's oversight. *See* Md.Code (1988, 1995 Repl.Vol.) § 13–107 of the State Fin. & Proc. Article.[15]

### (c)

The appellants' second and final contention is that the contingency fee contract violates due process and public policy. Specifically, they maintain:

"[T]he Contingent Fee Contract creates an improper motivation for [outside counsel] as lawyer for the State. [Outside counsel] has an overwhelming financial interest to seek maximum possible money damages irrespective of the interests of justice [and] public policy. This financial interest is at odds with the duty of a public official and the fair and impartial administration of justice."

Appellants urge this Court to be guided by the principle we recognized in *Montgomery County Bd. of Appeals v. Walker*, 228 Md. 574, 180 A.2d 865 (1962). In that case, we said:

"Influences which could affect the mind of one in a position of public trust are so subtle and difficult to appreciate, that in the end our decision must be guided by the general principle that no public officer who has a personal or pecuniary interest, direct or indirect, in the outcome of a case should participate in that matter."

*Id.* at 580, 180 A.2d at 868. *See also Sinclair v. State*, 278 Md. 243, 254, 363 A.2d 468, 475 (1976). Citing *Young v. United States ex. rel. Vuitton Et Fils S.A.*, 481 U.S. 787, 804, 107 S.Ct. 2124, 2136, 95 L.Ed.2d 740 (1987), appellants further maintain that this principle equally applies when a private attorney is specially retained by the State as an assistant counsel.

---

**15.** The Legislature has given the Attorney General oversight authority over a procurement officer of a unit of State Government who intends to "enter into a sole source procurement contract to obtain the services of a contractor in connection with: (i) *threatened or pending litigation*; (ii) appraisal of real property for acquisition by the State; or (iii) collective bargaining." Md.Code (1988, 1995 Repl. Vol.) § 13–107 of the State Fin. & Proc. Article (emphasis supplied).

Instructive of the proper application of the above-stated principle to the instant case, the appellants argue, is *People ex. rel. Clancy v. Superior Court,* 705 P.2d 347, 39 Cal.3d 740, 218 Cal.Rptr. 24 (1985), *cert. denied,* 475 U.S. 1121, 106 S.Ct. 1638, 90 L.Ed.2d 184 (1986). In that case, the Supreme Court of California, on grounds of public policy, invalidated a contingency fee contract that the City of Corona entered into with outside counsel to bring abatement actions on behalf of the municipality under a public nuisance ordinance regulating adult bookstores. The Court disqualified outside counsel because "the abatement of public nuisance involves a balancing of interests," which included (1) the public's interest in ridding the city of a dangerous condition, (2) the landowner's interest in using his property, (3) the landowner's First Amendment interest in selling protected material, and (4) the public's interest in having such materials available for purchase. *Clancy,* 705 P.2d at 352, 39 Cal.3d at 749, 218 Cal.Rptr. at 29. The court also observed that "[p]ublic nuisance abatement actions share the public interest aspect of eminent domain and criminal cases, and often coincide with criminal prosecutions." *Id.* ("A person who maintains or commits a public nuisance is guilty of a misdemeanor."). "This connection between the civil and criminal aspects of public nuisance law," the court said, "supports the need for a neutral prosecuting attorney." *Id.* at 353, 39 Cal.3d at 749, 218 Cal.Rptr. at 30. Thus, "any financial arrangement that would tempt the government attorney [or a representative] to tip the scale cannot be tolerated." *Id.* at 353, 39 Cal.3d at 749, 218 Cal.Rptr. at 29. Early in its analysis, however, the court noted:

"Nothing we say herein should be construed as preventing the government, under appropriate circumstances, from engaging private counsel. Certainly there are cases in which a government may hire an attorney on a contingent fee to try a civil case.... But just as certainly there is a class of civil actions that demands the representative of government to be absolutely neutral. This requirement precludes the use in such cases of a contingent fee arrangement."

*Id.* at 352, 39 Cal.3d at 748, 218 Cal.Rptr. at 29.[16]

■ Clearly, the instant case is distinguishable from *Clancy*, as there are no constitutional or criminal violations directly implicated here, and, hence, there is no potential conflict of interest.[17] Also, and more important, notably absent from *Clancy* is a legislative enactment authorizing the "special employment" of outside counsel in "extraordinary" cases. Equally important, is the absence of the oversight of an elected State official, who "shall have the authority to control all aspects of [outside counsel's] handling of the litigation," and whose "authority shall be final, sole and unreviewable." Contract at ¶ 2.1. These, we believe, are significant material distinctions which permit a finding that the instant contingency fee contract is not violative of due process or public policy.

Also, although the principle of impartiality, articulated in *Montgomery County Bd. of Appeals v. Walker*, is generally applicable to cases concerning public officials, the question of "[w]hether, in a particular case, a disqualifying interest exists, is a factual question and is governed by the circumstances of that case, and the enunciation of a definitive rule is not possible." *Walker*, 228 Md. at 580, 180 A.2d at 868. *Walker* is readily distinguishable from the present case. In *Walker*, Philip Fairbanks, an attorney, later a judge of the Circuit

---

**16.** The False Claims Act, 31 U.S.C. §§ 3729–3731, permits *qui tam* plaintiffs and private attorneys to sue on behalf of the federal government and recover damages and penalties for allegedly fraudulent charges to the United States. A successful *qui tam* plaintiff receives between 15 and 30 percent of the proceeds or settlement of the action. *Id.* at § 3730(d)(1),(2). *See United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 745–47 (1993); *United States ex rel. Robinson v. Northrop Corp.*, 824 F.Supp. 830, 833 (N.D.Ill. 1993).

**17.** The cases upon which the appellants principally rely involve criminal matters. *See Sinclair v. State*, 278 Md. 243, 254, 363 A.2d 468, 475 (1976) (prosecutor may have financial and personal stake in civil litigation that is related to a criminal case in which he is participating). *Young v. United States ex rel. Vuitton Et Fils S.A.*, 481 U.S. 787, 804, 107 S.Ct. 2124, 2136, 95 L.Ed.2d 740 (1987) (private attorney of a party who stood to benefit from a court order was appointed by the government to prosecute a criminal contempt action for an alleged violation of that order).

Court for Montgomery County, was appointed to fill a vacancy on the five-member Zoning Board. During the evaluation process of an application seeking "special exception," Fairbanks disqualified himself from the matter because he had previously resided in the community where the special exception was sought, he had vigorously opposed the original application, and he had been legal counsel for the apartment house corporation of which one of the applicants is the sole owner. As a result of Fairbanks' voluntary disqualification, the Board's vote on the special exception application was a 2–2 split vote. An appeal was taken to the circuit court, which found that Fairbanks failed to show "substantial or grave reasons" for disqualifying himself and ordered Fairbanks to participate in the vote. On appeal, this Court ruled that, because Fairbanks believed that he could not objectively consider the special exception application, we were in no position to hold otherwise. Clearly, these facts bear no resemblance to the instant case.

Finally, the appellants posit that "[p]ublic policy requires that an attorney representing the State must be completely unbiased in the exercise of governmental power. Allowing an attorney representing the State to have a direct stake in the [tobacco litigation] ... contravenes this policy." The Supreme Court of the United States, however, has held that due process does not necessarily preclude a prosecutor from having a personal or financial interest in the outcome of a case seeking civil penalties. In *Marshall v. Jerrico*, 446 U.S. 238, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980), for example, the issue was whether the reimbursement provision of the Fair Labor Standards Act violated due process by creating an impermissible risk of bias in the Act's enforcement and administration, as each regional office received a share of the total reimbursements collected. The Supreme Court observed that the functions of the assistant regional administrator, who is charged with enforcing the Act, resemble those of a prosecutor more closely than those of a judge. The Court said:

"Prosecutors need not be entirely 'neutral and detached' .... In an adversary system, they are necessarily permit-

ted to be zealous in their enforcement of the law. The constitutional interests in accurate finding of facts and application of law, and in preserving a fair and open process for decision, are not to the same degree implicated if it is the prosecutor, and not the judge, who is offered an incentive for securing civil penalties."

446 U.S. at 248, 100 S.Ct. at 1616, 64 L.Ed.2d at 192. The Supreme Court, however, refrained from establishing "with precision what limits there may be on a financial or personal interest of one who performs a prosecutorial function." In the present case, we hold that outside counsel's interest in the outcome in the tobacco litigation, subject to the oversight of the Attorney General, does not exceed reasonable limits of a private attorney performing a prosecutorial function.

JUDGMENT OF THE CIRCUIT COURT FOR TALBOT COUNTY AFFIRMED, WITH COST TO BE PAID BY THE APPELLANTS.