Roger CONANT, et al., Appellants,

v.

ROBINS, KAPLAN, MILLER & CIRE-SI, L.L.P., solely in its capacity as public servant and Special Attorney for the State of Minnesota, Respondent.

No. C0–99–626.

Court of Appeals of Minnesota.

Dec. 21, 1999.

144

Stephen B. Young, Clay R. Moore, Minneapolis, for appellants.

Michael V. Ciresi, Roberta B. Walburn, Gary L. Wilson, Robins Kaplan Miller Ciresi, L.L.P., Minneapolis, for respondent.

Considered and decided by AMUNDSON, Presiding Judge, TOUSSAINT, Chief Judge, and KLAPHAKE, Judge.

## OPINION

TOUSSAINT, Chief Judge.

Appellants Roger Conant and Senator Thomas Neuville appeal the summary judgment dismissing their action against Robins, Kaplan, Miller Ciresi, L.L.P., in its capacity as special attorney for the State of Minnesota, challenging the law firm's direct receipt of costs and attorney fees from the settling defendants. Appellants contend that the law firm was required to deposit these funds into the state treasury, and that the law firm could receive payment for its services only through a legislative appropriation. Appellants assert they have standing to raise these issues based on their status as taxpayers because public funds are at issue. Appellant Neuville claims he has standing as a state senator because the law firm's actions deprived him of the opportunity to vote on whether to appropriate state funds in payment for the law firm's services as special attorney. Finally, appellants challenge the district court's imposition of sanctions under Minn. R. Civ. P. 11. We affirm on the merits, but reverse the sanctions.

## FACTS

In 1994, the State of Minnesota retained the law firm of Robins, Kaplan, Miller Ciresi, L.L.P., and attorney Michael Ciresi to serve as special attorneys to represent the state in litigation against certain tobacco companies to recover damages arising from the sale and distribution of cigarettes. The special attorneys, although serving at the direction of the attorney general, were not considered state employees and were not eligible for state benefits except as expressly provided. The retainer agreement provided that the state would reimburse the special attorneys for their costs and pay them a contingency fee of 25 of the state's total recovery.

The law firm filed a complaint in August 1994, and trial began in January 1998. In May 1998, after the parties rested but before the case was submitted to the jury, the parties settled and judgment was entered. The settling tobacco companies agreed to make payments to the state which, over a period of 25 years, would amount to $6.1 billion. They also agreed to restrictions on advertising and other injunctive relief.

In a separate attorney fee agreement, the settling tobacco companies agreed to pay directly to the law firm costs of $4,000,000 and attorney fees in the amount of $440,825,000. In turn, the law firm agreed to relinquish its right to recover costs and much larger attorney fees from the state under the 1994 contingency fee retainer agreement.

Challenges to the fee agreement arose almost immediately. In a May 20, 1998, letter, State Senator Gary W. Laidig asked the legislative auditor to review the legal expenses the state incurred and the costs and fees the law firm received. The auditor twice refused to conduct an audit because the state did not pay any of the costs or fees. Also on May 20, attorney Stephen Young (one of appellants' attorneys here), sought review of the fee agreement before the Minnesota Lawyers Professional Responsibility Board. After reviewing the documents, the director declined to investigate because the complaint failed "to state a basis for a reasonable belief that misconduct has occurred," and determined that discipline was not warranted. When Young appealed the director's decision, the board affirmed.

Appellants challenged the fee agreement by filing an action in district court against the law firm in its capacity as special attorney. They sought an order (1) prohibiting the law firm from retaining the money it received for costs and attorney fees and requiring it to deposit the funds into the state treasury; (2) imposing a constructive trust on these funds pending final judgment; (3) seeking an immediate accounting of all such money received by the law firm; (4) requesting a declaratory judgment that the attorney-fees contract was null and void under Minn.Stat. 8.06

(1998) to the extent it allowed the law firm to retain compensation or reimbursement from a source other than a legislative appropriation; and (5) awarding costs and disbursements.

The law firm moved for dismissal and sanctions, while appellants moved for summary judgment. The district court converted the motion to dismiss to one for a summary judgment, granted the law firm's motion, and awarded sanctions of $12,000 to be paid into the state treasury.

Conant and Neuville appeal. Their petition to the supreme court for accelerated review was denied.

### ISSUES

I. Do appellants have standing to bring this action in their capacity as taxpayers?

II. Does appellant Neuville have standing to bring this action in his capacity as a state senator?

III. Did the district court abuse its discretion in imposing rule 11 sanctions?

### ANALYSIS

 On appeal from summary judgment, an appellate court will determine whether there are any genuine issues of material fact or whether the district court erred as a matter of law. *Offerdahl v. University of Minn. Hosps. Clinics*, 426 N.W.2d 425, 427 (Minn.1988). Where, as here, the material facts are not in dispute, the appellate court will review de novo whether the district court erred as a matter of law. *Norwest Bank Minn., N.A. v. State Farm Mut. Auto. Ins. Co.*, 588 N.W.2d 743, 745 (Minn.1999). Likewise, when facts relating to whether a party has standing to bring an action are not in dispute, an appellate court will decide the issue as a matter of law. *Joel v. Wellman*, 551 N.W.2d 729, 730 (Minn.App.1996), *review denied* (Minn. Oct. 29, 1996). In resolving a standing challenge, it is sometimes necessary to address the specific aspects of the claim. *See State by Humphrey v. Philip Morris Inc.*, 551 N.W.2d 490, 493 (Minn.1996) (addressing specific statutory and common law requirements of claims in analyzing standing issue).

### I.

 Standing requires "that a party have a sufficient stake in a justiciable controversy to seek relief from a court." *Philip Morris*, 551 N.W.2d at 493 (citation omitted). A sufficient stake may exist if the party has suffered an "injury-in-fact" or if the legislature has conferred standing by statute. *Id.* This standing requirement also applies to citizens who bring lawsuits in the public interest, in that it requires either (1) damages distinct from the public's injury, or (2) express statutory authority. *Channel 10, Inc. v. Independent Sch. Dist. No. 709*, 298 Minn. 306, 312, 215 N.W.2d 814, 820 (1974). Accordingly, absent express statutory authority, such suits are generally dismissed unless the taxpayers can show "some damage or injury to the individual bringing the action which is special or peculiar and different from damage or injury sustained by the general public." *Id.* (citation omitted). This requirement precludes citizens from bringing lawsuits against governmental agencies based only on their disagreement with policy or the exercise of discretion by those responsible for executing the law. *McKee v. Likins*, 261 N.W.2d 566, 571 (Minn.1977). Generally, "[r]ights of a public nature are to be enforced by public authority rather than individual citizens so as to avoid multiplicity of suits." *Channel 10*, 298 Minn. at 312, 215 N.W.2d at 820 (citation omitted).

 Nonetheless, taxpayers have the right "to maintain an action in the courts to restrain the unlawful use of public funds * * *." *McKee*, 261 N.W.2d at 571. At the heart of this standing dispute is whether the moneys for costs and attorney fees constitute "public funds," giving the taxpayers a sufficient stake to challenge the legality of their use.

■ Taxpayers have a "real and definite interest in preventing an illegal expenditure of tax money" and have standing to challenge projects likely to increase their overall tax burden. *Arens v. Village of Rogers*, 240 Minn. 386, 392, 61 N.W.2d 508, 514 (1953); *see also Phillips v. Brandt*, 231 Minn. 423, 429, 43 N.W.2d 285, 289 (1950) (holding taxpayer had standing to challenge allegedly illegal payment of salary for city position because taxes were source of funds). But the funds in dispute here do not arise directly from state or municipal taxes, and the law firm argues that consequently appellants do not have standing to challenge their use. *See St. Paul Area Chamber of Commerce v. Marzitelli*, 258 N.W.2d 585, 589 (Minn.1977) (holding state taxpayers lacked standing to challenge legislation halting construction of highway because any money lost as result originated from federal funds).

■ Although the funds do not originate from state or municipal taxes, appellants contend they constitute public funds because they should have been deposited in the state treasury and disbursed only through a legislative appropriation. The supreme court held that public funds were at issue, giving a taxpayer standing to maintain a lawsuit, where a statute required that moneys received from a challenged state fishing operation be deposited into the state treasury and then appropriated the funds into the relevant revolving fund. *Lipinski v. Gould*, 173 Minn. 559, 563–64, 218 N.W. 123, 125 (1928). Likewise, if, as appellants argue, these funds should have been deposited into the state treasury and disbursed only through appropriation, they may have standing in this action.

We first address whether the law requires that the funds the law firm received for its costs and attorney fees, like the funds from the settlement of the action, must be deposited directly into the state treasury. Appellants argue that the fees are an inseparable part of the total settlement, citing references in the fee agreement to the tobacco companies' obligation to pay the law firm based on its representation of the state. They argue that just as the state may recover attorney fees directly in an action in which the attorney general, rather than a special attorney, represents the state, so to should the state recover the attorney fees when the special attorney stands in the place of the attorney general. *See State by Humphrey v. Alpine Air Prod., Inc.*, 490 N.W.2d 888, 896 (Minn.App.1992) (allowing state to recover costs and reasonable attorneys fees pursuant to statutory authority), *aff'd*, 500 N.W.2d 788 (Minn.1993).

*Alpine Air*, however, does not address the specific issues raised here. Instead, we look to several cases that did consider whether fees may be paid directly to attorneys from funds recovered or saved by the state, or whether all such funds must be deposited in the state treasury, with fees then appropriated. In one such case, taxpayers successfully brought an action to challenge state highway contracts, and the state intervened. *Regan v. Babcock*, 196 Minn. 243, 244–45, 264 N.W. 803, 804 (1936). The supreme court declined to interfere with the decision by the district court authorizing payment of plaintiffs' expenditures, including attorney fees, out of the recovered funds without a special legislative appropriation. *Id.* at 249, 255, 264 N.W. at 806, 809.

Likewise, in another case, the county appointed special attorneys who successfully collected delinquent personal property taxes from an estate. *Board of Comm'rs v. Clapp*, 83 Minn. 512, 513, 86 N.W. 775, 775 (1901). The county sued the special attorneys when they retained a portion of the sums collected in payment of their attorney fees. *Id.* The court ruled that the amount constituting public funds "could not be determined until the expenses [including attorney fees] were known and deducted." *Id.* at 515, 86 N.W. at 776. The supreme court based its decision on the principle of equitable liens or set-offs, noting that the funds would not

have existed but for "the exertions of the attorney." *Id.* at 517, 86 N.W. at 777; *see Philip Morris Inc. v. Glendening,* 349 Md. 660, 709 A.2d 1230, 1241 (1998) (concluding that the gross recovery in tobacco litigation not considered state money subject to legislative appropriation until state collected recovery, less contingency fee and litigation expenses, and deposited funds into treasury).

Appellants, however, cite provisions regarding compensation for state officers and employees to argue that the law firm, as special attorney appointed by the attorney general, may receive payment for attorney fees only through a legislative appropriation, and must deposit any fees it receives into the state treasury. Minn. Stat. 15A.01 (1998); *Bush v. Arrowood,* 293 Minn. 243, 251, 198 N.W.2d 263, 268 (1972). In addressing this issue, we must look at the attorney general's authority to hire special attorneys and at any relevant law concerning their compensation.

The attorney general has broad power to conduct civil litigation on behalf of the state. Minn. Const. art. V, 1; Minn.Stat. 8.01 (1998); *Slezak v. Ousdigian,* 260 Minn. 303, 308, 110 N.W.2d 1, 5 (1961). The attorney general may hire special attorneys pursuant to Minn.Stat. 8.02, subd. 1.[1] Section 8.02, subdivision 1 does not directly authorize the attorney general to use appropriations to pay for special attorneys or specify any other method for paying special counsel. In contrast, several other provisions relating to special attorneys do specify the method for paying them. *See* Minn.Stat. 8.06 (authorizing attorney general to employ and fix compensation for special attorneys to represent all state officers, boards and commissioners, and providing attorney fees or salary to be paid from appropriations for such entities), 8.09–.10 (authorizing attorney general to employ attorneys on a 25 contingency-fee

basis to recover on claims against federal government and appropriating "amount of such compensation"); *see also* Minn.Stat. 8.15 subds. 1, 3 (authorizing attorney general to represent agencies, political subdivisions, and quasi-state agencies and to accept funds from such entities in addition to appropriation; also providing such funds must be deposited in general fund and deemed appropriated to attorney general). In the absence of similar language, we decline to imply a requirement that special attorney appointed under section 8.02 be paid only through an appropriation.

We next examine chapter 15A, which addresses compensation for public officers and employees named in the chapter, and provides that yearly salaries of state officers and employees are "as herein fixed" and are to be "in full payment for all services" they perform. Minn.Stat. 15A.01, subds. 1, 2 (1998). Appellants contend that under the supreme court's interpretation of chapter 15A, special attorneys are limited—as the attorney general is limited—to receiving compensation only through legislative appropriation. They specifically cite several paragraphs of the syllabus in *Bush,* which state that Minn. Stat. 15A.01 "limits the compensation of the attorney general or his special counsel," and that the "right of special counsel employed to represent the attorney general is a derivative right and his right to fees is not greater than that of the attorney general." 293 Minn. at 244, 198 N.W.2d at 264.

In *Bush,* the court addressed the situation in which the attorney general was required by statute to represent the beneficiaries of charitable corporations. 293 Minn. at 249–50, 198 N.W.2d at 267. The attorney general appointed special counsel pursuant to Minn.Stat. 8.02 to represent the state's interests in a particularly com-

1. Appellants do not challenge the attorney general's authority to hire special attorneys under Minn.Stat. 8.02, subd. 1. While respondent asserts that over the years attorneys general have appointed many special attorneys

pursuant to a contingent fee arrangement, the contingency fee agreement here is not at issue because the law firm relinquished its right to recover under it.

plex trust matter. 293 Minn. at 250–51, 198 N.W.2d at 267–68. At the close of the case, the attorney general had insufficient funds to pay the entire amount of the special attorney's fees, and the district court allowed special counsel to collect the unpaid portion from the foundation, which then appealed. *Id.* at 246–47, 198 N.W.2d at 265. The supreme court ruled that because Minn.Stat. 15A.01, subd. 2, provided that all salaries of the attorney general and his employees were to be in full payment of their services, the attorney general could not be paid from the foundation. *Id.* at 252, 198 N.W.2d at 268. Because the rights of the special attorney derived from that of the attorney general, the special attorney likewise could not collect its fees from the foundation. *Id.*

Distinctions between *Bush* and the case before this court lead us to conclude that it is not controlling. First, in *Bush,* a statute compelled the attorney general to appear to represent the state's interest. 293 Minn. at 250, 198 N.W.2d at 267 (citing statute requiring attorney general to represent beneficiaries of trusts in certain circumstances). Here, the attorney general chose to appear to seek to recover damages connected with the sale of distribution of cigarettes. Next, the district court in *Bush* authorized partial payment of attorney fees for special counsel from the foundation, which objected. 293 Minn. at 246–47, 198 N.W.2d at 265–66. Here, the tobacco companies voluntarily entered into the settlement agreement, paid the attorney fees, and have not objected. Consequently, while expansive language in *Bush* may have given appellants a basis for bringing the suit, the actual holding of the case is much narrower and is limited to cases in which the attorney general is required by law to appear, and in which special attorneys seek to be paid by the party entitled to be represented.

Finally, we address appellants' claim that under Minn.Stat. 15A.01, subd. 3 (1998), the law firm was required to deposit the moneys for costs and attorney fees into the state treasury. That section provides:

> All fees of any nature collected by any officer or employee named in this chapter in the performance of official duties for the state shall be paid into the state treasury.

*Id.* First, under the 1994 special attorney agreement, the special attorneys are not considered state employees. Further, the above section applies to officers and employees "named in this chapter," and includes constitutional officers and various commissioners and executive directors; special attorneys are not named in the chapter. *See* Minn.Stat. 15A.0815 (setting salary limits for various commissioners and executive directors), .082 (creating compensation council to establish compensation for constitutional officers and others) (1998).

In conclusion, because the challenged moneys are not state funds and because the law does not require an appropriation for payment of attorney fees for special counsel, the appellants do not have standing to bring this action.

## II.

We next address Senator Neuville's contention that he has standing in this lawsuit based on his status as a state legislator. He argues that he has a stake in the matter because when the tobacco companies paid the law firm directly, rather than depositing the money in the state treasury, this action deprived him of the opportunity to vote on whether and how much to appropriate for attorney fees.

In addressing this issue, we turn to a recent United States Supreme Court case for guidance, *Raines v. Byrd,* 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). There, members of Congress challenged the constitutionality of the Line Item Veto Act, which, despite their "nay" votes, passed both houses and was signed into law by the President. *Id.* at 814, 117 S.Ct. at 2315. To determine whether they had

standing to maintain the action, the Court addressed whether the legislators had met their burden of showing that "their claimed injury is personal, particularized, concrete, and otherwise judicially cognizable." *Id.* at 820, 117 S.Ct. at 2318. Determining that the burden was not met, the Court found the injury · was institutional, namely, the "diminution of legislative power," rather than personal. *Id.* The Court contrasted the situation to that in *Coleman v. Miller,* 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), in which the alleged injury, though institutional, was sufficiently concrete because if the state legislators were correct on the merits, their votes would be nullified. *Raines,* 521 U.S. at 822, 117 S.Ct. at 2319. The Court explained that its holding in *Coleman* stands, at most, for the proposition that

> legislators whose votes would have been sufficient to defeat (or enact) a specific legislative act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified.

*Id.* at 823, 117 S.Ct. at 2319 (footnote omitted). Consequently, it determined that because the legislators had not alleged any injury to them personally and because any institutional injury was abstract, they did not establish standing. *Id.* at 829, 117 S.Ct. at 2322.

Applying this reasoning, it is apparent that the senator is alleging an institutional, not a personal, injury that does not fall within the *Coleman* exception. Further, several other cases that the senator relies on are now of very limited effect, at best, in light of *Raines. Chenoweth v. Clinton,* 181 F.3d 112, 115 (D.C.Cir.1999) (finding it "untenable" in light of *Raines* to argue legislative standing existed based on deprivation of legislator's "right to participate and vote on legislation in a manner defined by the Constitution"). Consequently, we agree with the district court that the senator does not have standing as a legislator.

## III.

■ The district court imposed sanctions after determining that appellants' position was not well-founded in fact or law. An appellate court applies an abuse-of-discretion standard when reviewing a district court's decision to impose sanctions under Minn. R. Civ. P. 11. *Uselman v. Uselman,* 464 N.W.2d 130, 145 (Minn. 1990).

■ Under rule 11, parties who file papers with the court must certify that they are

> well grounded in fact and [are] warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law * * *.

A court may impose sanctions for violation of this rule. *Id.* But courts should construe rule 11 somewhat narrowly to avoid deterring legitimate or arguably legitimate claims. *Uselman,* 464 N.W.2d at 142. The district court's award of sanctions under this section will be reversed if the party's assertion is "not an objectively unreasonable one." *Bergmann v. Lee Data Corp.,* 467 N.W.2d 636, 641 (Minn.App. 1991), *review denied* (Minn. May 23, 1991).

■ Here, the district court granted the law firm's motion for rule 11 sanctions against appellants based on a determination that their position was not well founded in fact or law. Appellants made reasonable assertions concerning standing, the attorney general's powers, the meaning of public funds, and the applicability of language in the syllabus in *Bush,* 293 Minn. at 244, 198 N.W.2d at 264, relating to special attorneys. We agree with the district court's decision to grant summary judgment, but its decision that appellants' position was not well-founded in fact or law is not warranted, and we. reverse the award of sanctions.

## DECISION

We affirm the decision of the district court determining that appellants did not have · standing to bring this action and

granting summary judgment. We reverse the award of sanctions.

**Affirmed in part and reversed in part.**