DICKINSON, Presiding Justice,
for the Court:
¶ 1. A corporation settled its delinquent tax liability to the State of Mississippi by paying $100 million to the State, $4.2 million to a private charity, and $14 million to a private law firm hired by the Attorney General to pursue the claim. Mississippi’s Auditor demanded that, because the $18.2 million paid to the private charity and the law firm constituted public funds, it must be turned over to the State. The charity complied; but the law firm refused, claiming the payment of its fees was not made with public funds and, in any case, the Auditor had waived the State’s claim. The Auditor filed suit and the trial court granted summary judgment to the law firm. We reverse.
¶ 2. When the Attorney General pays special assistants, Mississippi statutory law requires that they be paid from the Attorney General’s contingent fund or from other funds appropriated to the Attorney General’s office by the Legislature.[1] Also, our constitution requires obligations and liabilities to the State (for instance, a tax liability) to be paid “into the proper treasury.”[2] Neither of these requirements was met in this case.
BACKGROUND FACTS AND PROCEEDINGS
¶ 3. After several years of aggressive acquisitions and market growth, World-Com — a Mississippi corporation located primarily in Clinton, Mississippi — became the second-largest provider of long-distance telephone service in America; but a series of accounting and securities scandals culminated in WorldCom’s July 21, 2002, petition for Chapter 11 bankruptcy protection. When WorldCom’s reorganization plan became effective, it merged into MCI Communications, Inc. (“MCI”).
¶ 4. The State of Mississippi — through its Attorney General, Jim Hood-filed a proof of claim in the bankruptcy, alleging WorldCom owed the State of Mississippi more than $1 billion for delinquent taxes, interest, and penalties. To assist in collecting the taxes, he signed a contingent-fee contract (“Retention Agreement”) with the Langston Law Firm, a Mississippi law firm.
*1273 ¶ 5. The Langston Law Firm entered into a separate contract to divide attorney fees with the law firm of Lundy & Davis, LLP, which likewise agreed to split its fees with the law firm of Aylstock, Witkin, Kreis & Overholtz. These three law firms, together with the Langston Law Firm’s then-principals — Joseph C. Langston and Timothy R. Balducci — are the appellees, and we refer to them herein collectively as “Langston,” “the Langston Firm,” or “Retained Counsel.”
¶ 6. Settlement discussions resulted in a written settlement agreement (“Settlement Agreement”) dated May 6, 2005, signed by MCI, Inc., on behalf of itself and the reorganized debtors, and by the State of Mississippi through Attorney General Hood. According to the terms, MCI settled its tax liability in exchange for some real property and payment “to or on behalf of the State,” the total sum of $118.2 million, divided as follows: The State received $100 million, Langston received $14 million, and the Children’s Justice Center of Mississippi (“Justice Center”) received $4.2 million.
¶ 7. State Representative Joey Fillin-gane — on behalf of the Mississippi Legislative Conservative Coalition, representing twenty-four members of the Mississippi House of Representatives — formally requested then-Auditor Phil Bryant to conduct a performance review and audit of the settlement. Auditor Bryant conducted the audit and issued three draft reports before issuing his final findings. The first draft, issued in September 2005, included four recommendations, two of which were that
[t]he Mississippi Legislature should clarify the Attorney General’s authority for the contengency fees for private attorneys retained by the Attorney General, ... [and] [t]he State Legislature should clearly determine the status of all fees received by private attorneys retained by the State Attorney General to act on the State’s behalf, even if those fees were not paid directly by the State of Mississippi.
¶ 8. The second draft audit, issued in October 2005, included four recommendations, two of which were that
[t]he Mississippi Legislature should clarify the conditions under which the Attorney General has the authority to determine the contengency fees for private attorneys retained by the Attorney General, ... [and] [t]he State Legislature or the Courts should clearly determine the status of all fees received by private attorneys retained by the State Attorney General to act on the State’s behalf, even if those fees were not paid directly by the State of Mississippi.
¶ 9. In his third draft, issued in September 2006, the Auditor made the following finding as to the $14 million:
The $14 million paid in attorney’s fee is ... part of the settlement “as payment of tax and interest to or on behalf of the State of Mississippi.” Initially, such payment should have been deposited into the State General Fund with all other MCI settlement funds. Then, there would have been the opportunity through the legislative process, to set aside funds in an amount the Legislature found to be appropriate to pay outside counsel hired by the Attorney General to represent the people of the State of Mississippi. In such cases where the Attorney General has a contract with a private law firm, it is the Legislature’s prerogative to always determine proper payment and appropriate that amount to the Attorney General’s Contingency Fund. These funds may then be audited as part of the financial statement of the State. (§ 7-5-7).
¶ 10. The draft went on to recommend that
*1274 [b]ecause the legislative process was bypassed in the appropriation of these funds, any portions of the settlement not authorized by the Legislature should be returned to the General Fund. The State Auditor’s office with the assistance of the Mississippi Attorney General should recover these public funds on behalf of the taxpayers of the State.
¶ 11. In his October 2006 official audit, Auditor Bryant stated that the Attorney General had lacked authority to enter into the settlement agreement because “he may only pay private attorneys out of contingency funds in his budget or from other funds appropriated to the office of the Attorney General by the Legislature.”
¶ 12. In his official Findings, the Auditor stated that the $14 million in attorney fees was part of the settlement “as payment of tax and interest to or on behalf of the State of Mississippi,” which should have been deposited into the State General Fund.... Based on this finding, the Auditor recommended that “[t]he State Auditor’s office with the assistance of the Mississippi Attorney General should recover these public funds on behalf of the taxpayers of the State.”
¶ 13. In November 2006, the Auditor foi’mally demanded that Langston and the Justice Center turn over to the State the $18.2 million they received from the MCI settlement proceeds. The Justice Center complied, but Langston refused, claiming the $14 million it was paid was not public funds. He did, however, offer a compromise, to which the Auditor responded that he would delay action “until a thorough review” of Langston’s offer of compromise could be completed.
¶ 14. On September 10, 2007, the Auditor posted a letter to the Attorney General, attaching a draft complaint, and demanding that he file suit to recover the $14 million. Eleven days later, Langston filed an adversary proceeding (a lawsuit in a bankruptcy court, related to a particular bankruptcy proceeding) in the MCI bankruptcy, seeking a declaratory judgment that the $14 million attorney-fee payment was proper under Mississippi law, and that the Auditor had waived, or was estopped from, challenging the settlement agreement.
¶ 15. On December 20, 2007, Auditor Bryant — both in his capacity as Auditor, and on behalf of the State of Mississippi— sued the Langston Firm in Hinds County Circuit Court, seeking recovery of the $14 million. The next day, two things happened in the bankruptcy court: The Auditor asked the bankruptcy court to abstain and to allow the matter to be settled in Mississippi state court; and the Langston Firm filed a motion for summary judgment.
¶ 16. In January 2008, Stacey Pickering became Mississippi’s Auditor, and was substituted for former Auditor Bryant in both the Mississippi litigation and in the bankruptcy proceedings.
¶ 17. The bankruptcy court ruled against Langston, holding that the Auditor’s claim was not a collateral attack on the settlement agreement, and that the issues related to the Auditor’s claim “were not before the [bankruptcy] Court in connection with approving the settlement of the Debtors’ tax obligations to the State, nor could they have been raised.”[3] The court further stated that the Auditor would have lacked standing to pursue the matter in the bankruptcy court, and that the issues raised by the Auditor were unique to Mississippi nondebtor parties and unrelated to the Debtors’ settlement with the State. The Langston Firm ap *1275 pealed the bankruptcy judge’s order, but the United States District Court affirmed the bankruptcy judge, stating in its order that “any decision on the merits of the claim is left to the Mississippi state court.”[4]
¶ 18. Meanwhile, back in the Mississippi litigation — after the suit had been removed to federal court and then remanded — all parties filed motions for summary judgment. The trial court denied the Auditor’s motion and granted summary judgment to the Langston Firm and the State of Mississippi, holding that “the subject funds are not public funds since the Lang-ston Law Firm received absolutely no funds from the State;” and that — since “no one lodged any objection to the settlement” in MCI’s bankruptcy proceedings— “the State Auditor has waived its right to lodge any objections” to the settlement agreement. The Auditor timely filed this appeal.
ANALYSIS
I. Preliminary Matters
A. Langston’s Right to Compensation
¶ 19. We wish to make clear at the outset that our opinion should not be read as addressing — one way or the other — the reasonableness of the amount of attorney fees involved, Retained Counsel’s right to be paid, or the validity of the Retention Agreement. Indeed, the Auditor has made no such challenges, nor has he argued that the Attorney General was prohibited, either from depositing the funds into his contingent fund and paying Retained Counsel, or from paying the attorney fees from funds appropriated to his office by the Legislature. We address today only the narrow question of whether Mississippi law allows public settlement funds due to the State of Mississippi to be paid directly to outside counsel.
B. The Issues Before Us
¶20. The Legislature has limited the Attorney General to two sources from which he may pay the private attorneys he appoints to assist with litigation filed in the State of Mississippi. In addressing the payment of such outside counsel, Mississippi law states:
The compensation of appointees and employees made hereunder shall be paid out of the attorney general’s contingent fund, or out of any other funds appropriated to the attorney general’s office.[5]
¶ 21. Because the statute includes the mandatory term “shall,” we do not view its restriction as a suggestion — it is a mandate.[6] The statutory restriction was in place when the Attorney General and Langston signed the contract, and they cannot now claim they are not subject to it.
¶ 22. Indeed, rather than attack the statute’s mandate, the Langston Firm argues that the statute does not apply, because it was not paid with public funds. The Attorney General makes the same argument, but then goes further, arguing that he has authority — without legislative appropriation — to pay private attorneys with public funds. And both Langston and the Attorney General argue that the Auditor waived the State’s claim to the $14 million.
¶ 23. While the parties have advanced numerous arguments, and still more numerous sub-issues, this case requires us to address only three questions: *1276 (1) Was the $14 million public funds? If so, (2) did the Attorney General have authority to allow MCI to use those public funds to pay private lawyers without legislative approval or compliance with Section 7-5-7? If not, (3) did the Auditor waive the State’s claim to the $14 million? For these questions of law and statutory interpretation, we employ a de novo standard of review.[7] We also consider whether the settlement violated Section 100 of Article Four of the Mississippi Constitution.
C. Timing of the Settlement
¶ 24. Before addressing the first question, we think it important to analyze the timing of the settlement. Both the Attorney General and the Langston Firm base almost all their arguments on the premise that the $14 million attorney fee was negotiated and paid after MCI had settled the State’s tax claim. They argued as much in their briefs and here in oral argument. And Attorney General Hood stated in an affidavit that the “settlement with the State was complete prior to the attorneys fees being finally negotiated between Joey Langston, Billy Quin, and MCI.” (Emphasis added.)
¶ 25. We neither take lightly nor casually dismiss the representations of officers of this Court — whether made in briefs or sworn affidavits. But for several reasons, we must reject the representation that MCI’s settlement with the State was complete before MCI negotiated with Langston and agreed to pay the $14 million in attorney fees, and to make a $4.2 million charitable contribution to the Justice Center.

1.Payment of Tax

¶ 26. First, the Settlement Agreement clearly states that — “in full and complete satisfaction” of its tax debt to the State— MCI agreed to pay $100 million to the State, $14 million to Langston, and $4.2 million to the Justice Center. And there was only one Settlement Agreement— signed by the Attorney General on behalf of the State of Mississippi. Thus, the Settlement Agreement’s own wording belies any claim that the tax-claim settlement was consummated before the attorney-fee negotiation.

2. Langston’s Representations

¶ 27. Langston insists that the $14 million it received was not part of MCI’s tax payment. And Attorney General Hood argues the $14 million was not even part of the settlement with the State, because it was negotiated after the settlement with the State was complete. But in pleadings filed in the trial court, Langston makes the following statement to the contrary; “Langston admits that MCI agreed to a settlement of its tax liability on May 6, 2005, by virtue of the Settlement Agreement and Release which was signed by counsel for MCI and Attorney General Jim Hood.” And it is undisputed that, in that Settlement Agreement, the $14 million clearly was part of the settlement of MCI’s tax payment.

3. Merger Clause

¶ 28. The Settlement Agreement includes a merger clause that states:
This agreement constitutes a single, integrated written contract that expresses the entire agreement of the Parties with respect to the matters contained herein and supersedes all negotiations, prior discussions, and preliminary agreements, either oral or written. The par *1277 ties disclaim reliance on any and all prior agreements, representations, negotiations, and understandings, oral or written, express or implied.
¶ 29. In arguing that the State’s claim was settled before the attorney-fee negotiations took place, Attorney General Hood stated in his affidavit that
neither I nor any of the other parties that participated in the MCI settlement considered the payment for attorney fees to be part of the State’s recovery. The settlement with the State was complete prior to the attorneys fees being finally negotiated between Joey Lang-ston, Billy Quinn, and MCI.
¶ 30. While the Attorney General’s representations may very well reflect what he believed to have happened, he signed a Settlement Agreement that says otherwise. And the provisions of a written agreement ordinarily will prevail over pri- or conflicting verbal understandings.[8] This is particularly so where, as here, the written agreement includes a merger clause that states the $14 million was part of MCI’s payment of its tax liability. The Settlement Agreement makes no mention of separate negotiations for attorney fees after MCI settled its tax liability.
A No Fine or Penalty
¶ 31. The Settlement Agreement clearly provides that “no part of the Settlement Payment [which includes the $14 million] is a fíne or penalty.” So if, as the Attorney General and Langston suggest, the $14 million was not part of MCI’s payment of its tax liability — and it was not a fíne or penalty — we struggle to understand what it could have been. We reject the notion that MCI gratuitously paid Langston $14 million it could have képt. The Settlement Agreement’s provisions and the facts clearly indicate that the $14 million was a part of MCI’s negotiation and payment of its tax liability.
II. Public Funds
¶ 32. In its brief, the Langston Firm, claiming the summary judgment was “proper because the Attorney Fees are not ‘public funds’ as a matter of Mississippi law,” makes six arguments. We shall address them all.
A. Attorney Lien
¶ 33. Langston argues that the $14 million was not public funds because the attorneys hold a “superior lien” on the $14 million. As authority, Langston cites Collins v. Schneider, in which this Court stated that “an attorney has a lien on the funds of his client for the services rendered in the proceeding by which the money was collected.”[9] The Attorney General cites Halsell v. Turner[10] for the same proposition. For several reasons, we And no merit in this argument.
The Client’s Funds?
¶34. First, both Collins and Halsell specifically limit the application of an attorney lien to funds belonging to the client (who, in this case, is the State of Mississippi). So it is surprising that Langston and the Attorney General make this argument, because both go to great lengths to convince us that the $14 million was never the client’s — the State of Mississippi’s — money. Indeed, the Attorney General stated *1278 by affidavit that “[none] of the parties involved considered the payment of the attorneys’ fees to be part of the State’s recovery.”
¶ 35. The Attorney General further stated that the State’s tax claim was settled “prior to the negotiation of fees between [Langston] and [MCI],” and that “[none] of said attorneys’ fees were deposited into or transferred out of the State Treasury or any other State-held account.” Likewise, Langston argues that the $14 million was “not ‘received, collected by, or available for the support of or expenditure’ [11] by the state,” but instead “always belonged to Retained Counsel.”
¶ 36. In summary, Langston and the Attorney General both argue on the one hand that the $14 million never belonged to the client (the State of Mississippi); but then argue on the other hand that Langston holds an attorney lien on the funds, citing as authority cases that recognize an attorney’s lien on funds that do belong to the client (the State of Mississippi). These arguments are irreconcilable. Neither Langston nor the Attorney General cites any authority for the proposition that an attorney’s lien may be applied to funds not belonging to the client, nor do they argue in the alternative that an attorney’s lien would apply if the disputed funds were public funds. And this Court has held in numerous cases that we will not review an issue that is totally unsupported by any authority.[12]

Held in trust?

¶ 37. Furthermore, even though we find today that the $14 million was public funds, we nevertheless reject Lang-ston’s assertion that “the lawyers have a lien against [the $14 million],” allowing them to withhold it from the State. It is true that, under certain circumstances, an attorney’s lien is “[t]he right of an attorney to hold or retain a client’s money or property....”[13] But it is also true that — if Langston is truly asserting an attorney’s lien, as he claims — the $14 million would be in his trust account, which it is not.
¶ 38. The Mississippi Rules of Professional Conduct state: “A lawyer shall hold clients’ and third persons’ property separate from the lawyer’s own property,” and the “[f]unds shall be kept in a separate trust account....”[14] Langston does not even pretend that he is asserting a lien on the $14 million in client funds he holds in trust. Instead, Langston quite forthrightly tells us that the money has been disbursed-partly to itself, partly to another law firm, and partly (“millions”) to the state and federal government in taxes. So by Langston’s own admission, even if an attorney lien were proper in this case, there are no funds in trust on which to assert it.

Section 7-5-7

 ¶ 39. Also, even if Langston did hold the $14 million in trust, it could not assert an attorney’s lien on it, nor could it collect fees from it. The provisions of the common law — and this includes the concept of attorney’s liens-are subject to modification by the Legislature. And our Legislature has carved out a special, statutory, *1279 payment requirement for private lawyers who work for the Attorney General; they may be paid only from the Attorney General’s contingent fund, or from funds appropriated by the Legislature.[15] Specifically, the statute provides, in relevant part:
The attorney general is hereby authorized and empowered to appoint and employ special counsel, on a fee or salary basis, to assist the attorney general in the preparation for, prosecution, or defense of any litigation in the state or federal courts ... in which the state is a party or has an interest.
The attorney general may designate such special counsel as special assistant attorney general, and may pay such special counsel reasonable compensation to be agreed upon by the attorney general and such special counsel, in no event to exceed recognized bar rates for similar services.

The compensation of appointees and employees made hereunder shall be paid out of the attorney general’s contingent fund, or out of any other funds appropriated, to the attorney general’s office.

[16]

¶ 40. This statute clearly limits to two, the sources from which the Attorney General was authorized to pay Langston’s attorney fees: the “attorney general’s contingent fund,” or “other funds appropriated” to his office. The statute does not allow direct payment of attorney fees from taxes collected through litigation. And the statute’s mandatory language includes no option for payment by assertion of, and execution upon, an attorney’s hen on public funds.
¶ 41. We wish to make it clear that we do not call into question the right of the Attorney General to enter into contingency-fee contracts with outside counsel. But contracts with lawyers hold no special privilege. They are — as are all other contracts — subject to, and restricted by, applicable law. For instance, attorneys who enter into contingent-fee contracts in workers’ compensation cases are restricted by statute to an attorney fee of twenty-five percent, regardless of any contract provision to the contrary. And while a contract with a larger percentage would not be void, it would be subject to the statutory restriction.

Section 27-75-15

¶ 42. By contrast, where lawsuits must be filed in other states to collect taxes due to Mississippi, the Legislature has made a special provision for the payment of attorney fees to counsel from those states. Section 27-75-15 allows the Attorney General to
employ attorneys residing in a sister state, district or territory, where suits are instituted to recover taxes due the State of Mississippi.... [S]uch attorney fees may, within the discretion of the designated officers, be set on ... a contingent fee basis. The ... contingent fee shall be deducted from and paid out of the proceeds of the particular claim, subject, however, to the approval of the governor as to the employment and amount of such fee in either instance.[17]
¶ 43. This statute is instructive for two reasons. First, its safeguard requirement is the Governor’s approval of the fees, rather than Section 7-5-7’s requirement of appropriation by the Legislature. We find it illogical that the Legislature would require the Attorney General to obtain the Governor’s approval of fees to be paid to *1280 counsel in another state, but allow him to pay Langston with no one’s approval.
¶ 44. Second, the statute limits the class of outside attorneys the Attorney General may pay “out of the proceeds” of a particular claim. By granting the Attorney General the limited and specific authority to use proceeds to pay “attorneys residing in a sister state,” the statute excludes all other classifications, including attorneys residing in this state, who pursue claims filed in Mississippi. Stated differently, had the Legislature wanted to grant the Attorney General the authority to use the proceeds of a particular claim to pay attorneys who reside in Mississippi, it easily could have excluded from the statute its limitations to out-of-state attorneys filing claims in other states.
¶ 45. The Attorney General contracted with Langston, a Mississippi law firm, to pursue the State of Mississippi’s claim in the courts of Mississippi. So Section 27-75-15 does not apply, and Langston’s attorney fees may not be paid lawfully from funds held in trust, nor may they be paid directly “out of the proceeds” of the settlement by the defendant in the litigation. This restriction does not apply to other clients’ private lawyers, who lawfully may assert a lien on — and ultimately collect their fees from — client funds, wherever they may be found.

Article Four, Section 100 of the Mississippi Constitution

¶ 46. Finally, even if the Legislature had not carved out the statutory exception to the common-law attorney’s lien, Article Four, Section 100 of the Mississippi Constitution does not permit the Legislature to forgive, or even diminish, a tax obligation to the State, unless it is a doubtful claim. Nor does it permit MCI— or any other taxpayer — to satisfy its tax obligation to the State by remitting tax payments to private lawyers. Section 100 states:
No obligation or liability of any ... corporation held or owned by this state ... shall ever be remitted, released or postponed, or in any way diminished by the Legislature, nor shall such liability or obligation be extinguished except by payment thereof into the proper treasury; nor shall such liability or obligation be exchanged or transferred except upon payment of its face value; but this shall not be construed to prevent the Legislature from providing by general law for the compromise of doubtful claims.[18]
¶ 47. The Legislature may constitutionally permit the Attorney General to compromise doubtful claims. But once the claim is settled, and the amount due is determined and agreed through compromise, the claim and debt become liquidated, and full payment of the amount due must be made into the proper State treasury. Section 100 clearly requires that, for MCI to extinguish its tax debt, it must pay the full amount due into the proper treasury. Justice King, in his dissent, misreads our concern. The issue here is not whether the Legislature diminished the debt, but rather that less than the full amount due was paid into the proper state treasury.
¶ 48. In briefing this issue, the Attorney General raised several arguments. We shall address each of them.
1. Section 100 applies to unliquidated tax liabilities that become liquidated through judgment or settlement.
¶ 49. The Attorney General — while conceding that Section 100 generally applies *1281 to tax obligations — argues it does not apply here because MCI’s tax obligation “was controverted, uncertain, and therefore unliquidated.” He further states that “this Court repeatedly has held that only liquidated amounts of taxes fall within the purview of Section 100,” citing only two cases for the proposition, neither of which involve the issue before us.
¶ 50. In the first case — Pan American Petroleum Corp. v. Gully — the question presented was whether, in light of Section 100, a judgment “which was for a sum less than sued for, could not be pleaded as res judicata."[19] Holding that the judgment was indeed res judicata, this Court stated that Section 100 “was not intended to prevent the entry of a judgment for a less amount than the amount sued for where the claim was unliquidated and not capable of ascertainment by calculation, or some equally certain manner.” But Gully never addressed whether Section 100 required the judgment, when paid, to be paid into a “proper treasury.”
¶ 51. The second case — Robertson v. Weston Lumber Co. — likewise gives no support for the Attorney General’s argument. In fact, we note the following language from Robertson — cited with approval in Gully — that announces a principle quite important to this case:
But where the amount due the state is in its very nature uncertain, it is competent for the state or the officer having power to represent it, acting in good faith, to consent to a judgment liquidating the amount due.[20]
Thus, according to both Gully and Robertson, an unliquidated debt becomes liquidated when it is reduced to judgment, or when the parties agree on its amount.
¶ 52. The issue in Robertson was whether Section 100 prevented the State from compromising and settling a dispute over timber unlawfully cut from land the State held in trust. The Robertson Court did not address the issue before us today, that is, whether the payment of the debt— once it becomes liquidated — must be made into a “proper treasury” as required by Section 100.
¶ 53. MCI disputed the State’s tax claim, rendering it an unliquidated debt. But when MCI and the State settled, they signed a settlement agreement that was quite specific in setting forth the amount due the State from MCI. From that point on, there has been no dispute over the amount of MCI’s liquidated obligation to the State, so the Attorney General’s argument that Section 100 does not apply is without merit.
2. A private lawyer’s trust account is not a “proper treasury” unless specifically authorized by the Legislature.
¶ 54. The Attorney General argues that, even if Section 100 applies, it was not violated, because the $14 million attorney-fee payment was paid into the “proper treasury.” He further argues that (1) “ ‘proper treasury" simply means that the funds were remitted to a proper recipient;” (2) “the historic practice ... has been to permit the deduction of contingent fees from recoveries before payment of the balance over to the State;” and (3) to suggest otherwise “would be inconsistent with the holdings of all the modern American courts around the country....”

A. “Proper treasury” does not simply mean “proper recipient.”

¶ 55. The Attorney General asserts that “proper treasury” as used by Section 100 *1282 “simply means that the funds were remitted to a proper recipient.” He cites no cases from this Court so holding, but suggests his interpretation of the phrase “is consistent” with Adams v. Fragiacomo,[21] which says no more than that Section 100’s phrase “proper treasury” makes it difficult to apply Section 100 to nonmonetary obligations.
¶ 56. The only other authority the Attorney General offers in support of his interpretation of “proper treasury” is the following definition of the word “proper” from the 1910 edition of Black’s Law Dictionary: “that which is fit, suitable, adapted,, and comet.” But in that same dictionary, under the Ts, is found the following definition of “treasury”:
A place or building in which stores of wealth are reposited; particularly, a place where the public revenues are deposited and kept, and where money is disbursed to defray the expenses of government. Webster.
That department of government which is charged with the receipt, custody, and disbursement (pursuant to appropriations) of the public revenues or funds.[22]
¶ 57. The Auditor correctly argues that the State’s “proper treasuries” are limited to State depositories, and the dictionary the Attorney General urges us to consult supports that interpretation.
B. The Legislature may designate the “proper treasury. ”
¶ 58. The Attorney General next argues that direct payment of attorney fees cannot violate Section 100, because the Legislature at various times specifically has authorized the retention of contingent fees from tax proceeds. For example, the Attorney General cites an 1892 law authorizing the “state revenue agent” to “retain, as full compensation for his services and expenses, twenty per centum on all amounts collected and paid over by him....”[23]
¶ 59. The Attorney General argues that it cannot be unconstitutional to permit the retention of a contingent fee prior to paying the balance into the treasury, because, otherwise, Section 4199— passed two years after the ratification of the 1890 Constitution—would have been unconstitutional. But it is axiomatic and “obvious” that the Legislature holds the State’s purse strings:[24]
The right of the legislature to control the public treasury, to determine the sources from which the public revenues shall be derived and the objects upon which they shall be expended, to dictate the time, the manner, and the means both of their collection and disbursement is firmly and inexpugnably established in our political system.[25]
¶ 60. The Legislature determines where public funds come from and where they may go. It follows that the “proper treasury,” as that term is used in Section 100, is whatever the Legislature says it is. So, under Section 4199 of the 1892 Mississippi law, the Legislature determined where the tax revenues should go.
¶ 61. Section 4199 is notable for another reason. The fact that the Legislature found it necessary specifically to permit *1283 the revenue agent to retain a twenty-percent fee raises the presumption that such an arrangement would not have been permissible without the statute. And no such statute authorized the Attorney General to approve MCI’s direct payment of $14 million in public funds to a private law firm.
¶ 62. The Attorney General argues that Section 4199 was necessary only because the Office of the State Revenue Agent was not a constitutional office. We agree, but note that “special assistant attorney general” also is a creature of statute, not a constitutional office. In the absence of a statute like Section 4199 authorizing special counsel’s retention of fees before paying the balance of the debt to the State, special counsel’s private bank account cannot be a “proper treasury” within the meaning of Section 100.
¶ 63. The Attorney General’s final argument on this point is that “this Court recognized [in Robertson v. Miller[26]] that ‘[t]he twenty per cent commission for the fees due the state revenue agent for making such collections were deducted by him before said taxes were paid into the proper treasmy.’ ” [27] But the language quoted by the Attorney General was not the holding of this Court; rather it was an excerpt from the facts to which the parties had stipulated in the court below.

C. Other jurisdictions do not support the Attorney General’s argument.

¶ 64. The Attorney General claims: “[A]ny suggestion that the funds at issue in this case were not paid to the ‘proper treasury’ would be inconsistent with the holdings of all the modem American courts around the country that have decided the same issues presented in this case.”[28] The Attorney General provides no citation of authority discussing a constitutional provision like Section 100 or the construction of the term “proper treasury.” Instead, he relies on the assumption that other states prohibit state funds from being deposited into an “improper treasury,” repeating the same arguments and citing the same cases we have discussed elsewhere in this opinion. Suffice it to say here that the Attorney General has supplied no authority for his argument that other states having constitutional provisions analogous to Section 100 have permitted private attorneys to keep state funds without specific authorization or appropriation. This argument is without merit.
¶ 65. One final word about Collins and Halsell. We find no fault in our previous holdings in those cases, and do not now retreat from them. But both Langston’s argument and the holdings from those cases presuppose that the attorney holding the funds and asserting the lien is legally entitled to be paid the fees out of those funds. Langston was not, and is not.
B. Section 7-7-1
¶ 66. Langston next points to the language of Section 7-7-1, which states that “public funds” are “all funds which are ... available for the support of or expenditure by any state department, institution or agency, whether such funds be derived from taxes or from fees collected ... or from some other source....”[29] In essence, The Langston Firm argues that the $14 million was not “received, collected by, or available” for the State’s use, because the attorney fees were paid pursuant *1284 to a separate negotiation, and the funds were never transferred to the State.
¶ 67. The Langston Firm grounds the argument on two points, first stating that
[t]he Auditor’s contention that [MCI] paid $118.2 million to settle its income tax debt is contrary to the plain language of the Settlement Agreement.... [T]he Auditor conveniently ignores Paragraph 8(ii) of the Settlement Agreement [which] clearly states that, as a part of the settlement, [MCI] agreed to pay the attorney fees of Retained Counsel.
¶ 68. Second, the Langston Firm tells us: “After settling the State’s income tax claims, and in lieu of payment under the Retention Agreement, the Attorney General instructed The Langston Firm to negotiate Retained Counsel’s fee directly with [MCI].” This entire argument is based on the false notion (as discussed above) that MCI first settled its tax liability with the State, and then engaged in an entirely separate negotiation and agreement concerning the Langston Firm’s attorney fees.
¶ 69. We are skeptical of the notion that MCI — or, for that matter, any defendant — would settle with the plaintiff and then — instead of packing up and going home — charitably agree to negotiate, and then (with no legal obligation to do so) pay the plaintiffs attorney fees. But we need not speculate, because the Settlement Agreement provides conclusive evidence it did not happen here.
¶ 70. What did happen here is not complex. The State — claiming MCI owed more than a billion dollars in taxes, penalty, and interest — filed suit to collect. MCI agreed to pay $118.2 million as “payment of tax and interest.” But MCI did not pay all of its “taxes, penalty, and interest” directly to the State treasury, allowing the State, in compliance with statutory requirements, to pay its own attorney-fee bill from Langston. Instead, the Attorney General allowed MCI to use part of the State’s tax revenue to pay Langston.
¶ 71. The fact that $14 million of MCI’s taxes has not yet been filtered through the State treasury does not make it any less a payment of taxes. We find the $14 million was — and is — part of MCI’s payment of its tax liability to the State; and we further find that the $14 million was — and is— “available for the support of or expenditure by any state department,” as referenced in Section 7-7-1.
C. Section 7-5-7
¶ 72. The Langston Firm next argues that “[i]f public funds are not used to compensate outside counsel,” Section 7-5-7 is inapplicable and “never comes into play.” We agree. But the question of whether the $14 million was public funds is not answered by a statute that applies if it was public funds. This argument has no merit.
D. The Law in Other States
¶ 73. The Langston Firm argues its position is supported by “the overwhelming weight of legal authority on the topic,” specifically citing several cases from other states and an article from a legal encyclopedia that states:
A statute that allows the attorney general to hire assistants and to pay them from appropriations does not prohibit the attorney general in the exercise of his or her common-law power from entering into contingency fee arrangements or agreements that otherwise provide for civil defendants sued by the state to pay attorney fees directly to the *1285 state’s outside counsel.[30]
¶ 74. But further review reveals that, as its authority, the article cites State ex rel. Nixon v. American Tobacco Co., Inc., a Missouri case interpreting a Missouri statute that is different from Mississippi’s in one crucial respect. The Missouri statute provides that “compensation and expenses of said assistants and employees may be paid out of any state or federal funds appropriated to said department for such purposes.”[31] By contrast, Mississippi’s statute says such compensation “shall be paid out of the attorney general’s contingent fund, or out of any other funds appropriated to the attorney general’s office.” [32] The Missouri statute’s permissive term “may,” is of no assistance in applying Mississippi’s statute, which includes the mandatory term “shall.”
¶ 75. Both the Langston Firm and the Attorney General cite People v. Philip Morris, in which the Illinois Supreme Court held that “tobacco settlement funds, which have never been in the state’s hands, are not ‘state funds’ until after ... attorney fees are paid and the funds go into the state treasury.”[33] But Illinois has a provision of law entitled “The Attorneys Lien Act” under which the Illinois legislature provided that
attorneys at law shall have a lien upon all claims ... which may be placed in their hands by their clients for suit or collection ... for the amount of any fee which may have been agreed upon by and between such attorneys and their clients.... [34]
¶76. Mississippi has no such act, but instead has a statute that limits the sources from which private attorneys employed by the Attorney General may be paid[35] and a constitutional provision that requires all funds due to the State to be paid into the State treasury. These differences in Illinois law and Mississippi law render People v. Philip Morris inapposite to the case before us today.
¶ 77. The other cases cited by Langston are likewise distinguishable. The Minnesota Court of Appeals held that fees paid directly to “special attorneys” were not public funds, but only after concluding that the Minnesota statute controlling such attorneys did not specify how those fees were to be paid.[36] Again, Section 7-5-7 distinguishes Mississippi law.
¶ 78. The Maryland Supreme Court also has found that contingent-fee payments do not constitute public funds, but (in part) because the applicable Maryland statute — unlike Mississippi’s — places no restrictions on the source of such payments.[37]
¶ 79. The only other authority cited by Langston on this point is a footnote in State v. Hagerty,[38] in which the issue before the North Dakota Supreme Court was whether the North Dakota Attorney Gen *1286 eral would be allowed to employ private counsel on a contingent-fee basis. The court held that contingent-fee contracts would be allowed, “unless such agreements are specifically prohibited by statute.”[39]
¶ 80. In the footnote, the court stated that certain statutory language (“compensation must be paid out of the funds appropriated therefor”) prevented payment of attorney fees from funds appropriated for a different purpose.[40] The North Dakota court did not address the issues before us today.
E. In Re Hood
¶ 81. The Langston Firm cites this Court’s holding in In re Hood,[41] but then says that “[f]or purposes of this appeal, the holding in In re Hood is neither remarkable nor relevant.” We agree.
F. Pursue Energy
¶ 82. Next, Langston argues that this Court’s holding in Pursue Energy Corp. v. Mississippi State Tax Commission[42] “supports Retained Counsel’s position, not that of the Auditor.” We find no support in Pursue Energy for Langston’s position. In fact, we find that former Attorney General Mike Mooi'e’s method of paying attorney fees to private counsel in Pursue Energy placed Attorney General Hood and Langston on clear notice that — while the Attorney General had authority to hire Langston on a contingent-fee basis — payment of the contingent fee would be subject to legislative appropriation.
¶ 83. In Pursue Energy, then-Attorney General Moore hired outside counsel to help the State Tax Commission assess and collect taxes from various entities, including Pursue Energy Corporation.[43] Pursue Energy challenged the retention agreement, arguing that it created a conflict of interest because it provided for the outside counsel to collect tax revenue on a contingent basis.[44]
¶ 84. Attorney General Moore — speaking on behalf of all parties to the contingent-fee contract — clarified by affidavit the terms of the retention agreement, stating that
it was understood by all that [the attorney] would not be paid out of any tax moneys recovered. Instead, it was contemplated that if recovery was had, the Attorney General would apply to the Legislature for an appropriation to pay the firm an amount to be measured by the terms of the retention agreement.[45]
¶ 85. In other words, the full amount recovered would be paid over to the State, and the attorneys would be paid by separate funds appropriated by the Legislature. Nevertheless, Pursue Energy argued the retention agreement was invalid.
¶ 86. For several reasons, we rejected Pursue Energy’s argument. First, we stated that Section 7-5-7 “places no restrictions upon the type of fee the Attorney General can negotiate....”[46] Next, we stated that the agreement did not create a conflict of interest because “[n]o ... divergence of interest exists in the case sub *1287 judice.” Finally — and more on point to the issue in this case — we stated:
Even more compelling is the freedom provided the Legislature in the instant case who could independently determine the fee payable to [the attorney] for the service, even to the extent that it could refuse to pay.[47]
¶ 87. In an attempt to characterize Pursue Energy as supportive of its arguments, the Langston Firm states:
This Court’s holding in Pursue Energy makes clear that the Legislature’s right to appropriate a contingency fee would not have been available in the absence of the subsequent modification of the retention agreement. Otherwise, the modification would not have been necessary.
¶ 88. As its only support for this statement, the Langston Firm cites the excerpt from Attorney General Moore’s affidavit filed in Pursue Energy, quoted above. We fail to see how this language provides any support for Langston’s arguments.
¶ 89. First, the language — although indeed found in the Pursue Energy opinion — is not this Court’s language, but rather was a quote from Attorney General Moore’s affidavit. So it is of no value in drawing any conclusion as to what would have happened, had there been no modification.
¶ 90. Second, we disagree with the Langston Firm as to the significance of the language. Outside counsel in Pursue Energy were to be paid by legislative appropriation, in compliance with Section 7-5-7. And in holding that the contingent-fee agreement was not illegal, we said:
Sections 7-5-5 and 7-5-7 ... governing the compensation of special counsel and investigators to the attorney general, permit payment on a fee, contract, or salary basis so long as payment is from the Attorney General’s contingent fund or from other funds appropriated to the Attorney General’s office.[48]
¶ 91. Finally, we note that much of the discussion about contingent-fee agreements has little relevance in this case because Langston did not receive a contingent fee. While there was a contingency-fee agreement, both Langston and the Attorney General tell us its terms were not followed, and the fees were negotiated between Langston and MCI, with the State taking no part. So for all these reasons, Pursue Energy provides no support for the Langston Firm’s arguments. Instead, it clearly sets forth the law we follow today.
III. Section 7-5-5
¶ 92. The Attorney General argues that, even if the $14 million was public funds, MCI’s direct payment to Langston was proper, because Section 7-5-5 does not restrict his authority to enter into contingent-fee agreements; it empowers him to retain special assistant attorneys general on a fee or contract basis, and it establishes the Attorney General as the sole judge of compensation for such assistants. We find several problems with this argument.

Contingent Fee?

¶ 93. First, while we agree that the Attorney General may enter into contingent-fee agreements with private counsel, the $14 million paid to Langston in this case was not a contingent fee, but rather was a negotiated fee. And, according to the Attorney General’s own representations to this Court, he was not “the sole judge” of the compensation. Indeed, the *1288 Attorney General tells us he had no involvement in deciding the fee.
¶ 94. Although the Attorney General and Langston did sign a contingent-fee agreement, Langston was instructed to negotiate attorney fees with MCI. In fact, in a letter responding to the Auditor’s findings, the Attorney General — referring to the attorney-fee negotiation — stated: “I told the attorneys that this was a matter between them and [MCI].... ”
¶ 95. So as it turned out, the Attorney General was not the sole judge of Lang-ston’s compensation — MCI was. And since Langston was not paid on a contingent-fee basis, but rather was paid a negotiated fee by MCI, neither the Attorney General’s authority to enter into contingent-fee agreements, nor his authority to judge the compensation, is at issue in this case.
“Primarily To Defending ”
¶ 96. We also note that Section 7-5-5 empowers the Attorney General to employ three assistants to “devote their time and attention primarily to defending and aiding in the defense in all courts of any suit, filed or threatened, against the State,” and “[w]hen circumstances permit, such assistants [the ones hired primarily to defend] may perform any of the attorney general’s powers and duties,” and
[t]o further prosecute and insure such purposes, the attorney general is ... authorized ... to employ such additional counsel as special assistant attorneys general ... on a fee or contract basis; and the attorney general shall be the sole judge of the compensation in such cases.[49]
¶ 97. This section addresses the Attorney General’s authority to employ assistants who “devote their time and attention primarily to defending and aiding in the defense” of the State of Mississippi. If the Attorney General’s Retention Agreement with Langston included the duty “primarily to defending” or “aid[ing] in the defense of’ the State, we are unable to discern it. The next section, Section 7-5-7 (discussed below), addresses the Attorney General’s authority to employ assistants “to assist the attorney general in the preparation for, prosecution, or defense of any litigation. ...”[50]

Pursue Energy: Section 7-5-5 Subject To Legislative Appropriation

¶ 98. In Pursue Energy, this Court addressed this very issue by stating:
Sections 7-5-5 and 7-5-7 ... governing the compensation of special counsel and investigators to the attorney general, permit payment on a fee, contract, or salary basis so long as payment is from the Attorney General’s contingent fund or from other funds appropriated to the Attorney General’s office.[51]
¶ 99. The Pursue Energy Court’s statement could not have been more clear. The restriction on sources from which the Attorney General is authorized to pay special counsel — whether employed under Section 7-5-5 or Section 7-5-7 — applies, regardless of the fee arrangement.

Section 100 of the Mississippi Constitution

¶ 100. Even if Section 7-5-5 did apply exactly as the Attorney General claims, a statute cannot trump the Mississippi Constitution. We find no exception to Section 100’s requirement that all obli *1289 gations and liabilities due the State must be paid into “the proper treasury,”[52] nor does any statute provide an additional fund from which the attorneys might be paid. The Legislature constitutionally may permit the Attorney General to compromise doubtful claims. But, once the claim is settled, and the amount due is determined and agreed through compromise, the claim and debt become liquidated, and full payment of the amount due must be made into the proper State treasury. Section 100 clearly provides that, in order to extinguish the debt, payment of the full amount due must be made into the proper treasury. Justice King, in his dissent, misreads our concern. The issue here is not whether the Legislature diminished the debt, but rather that less than the full amount due was paid into a proper state treasury.
IV. Waiver
¶ 101. The next issue we must address is whether the Auditor waived the State’s claim to the $14 million. Langston claims that, even if the $14 was public funds subject to Section 7-5-7’s restrictions, the Auditor waived his right to pursue the claim.
¶ 102. The state-court action that resulted in this appeal unfolded parallel to a bankruptcy-court action in New York, in which the Langston Firm requested a declaratory judgment that the State Auditor had waived (or was estopped from asserting) his right to challenge the settlement. The bankruptcy court held that the Auditor’s attempt to recoup the payment was not a challenge to the settlement agreement, that the Auditor couldn’t have challenged the agreement anyway, because the State already was represented in the proceeding by the Attorney General, and that the Auditor’s claims were strictly Mississippi state-law claims. And, after the Langston Firm removed this case to federal court, the district judge remanded for the same reason.
¶ 103. So, whatever law governs waiver and estoppel of creditor claims in a bankruptcy case, that law is inapposite here. The State Auditor is not challenging the settlement itself, but the Langston Firm’s receipt of money in violation of Section 7-5-7. The Auditor is asserting his authority under Section 7-7-211(g) to recover misappropriated public funds; he is not asserting a right as a creditor in a bankruptcy proceeding. The bankruptcy cases cited by Langston are irrelevant to the issue of whether the Auditor waived his right to proceed under Section 7-7-211(g).
¶ 104. Turning then to the waiver claim, our law is well-settled:
Waiver presupposes full knowledge of a right existing, and an intentional surrender or relinquishment of that right. It contemplates something done designedly or knowingly, which modifies or changes existing rights or varies or changes the terms and conditions of a contract. It is the voluntary surrender of a right. To establish a waiver, there must be shown an act or omission on the part of the one charged with the waiver fairly evidencing an intention permanently to surrender the right alleged to have been waived.[53]
¶ 105. Here, the only conduct alleged to constitute waiver was the State Auditor’s decision to wait thirty months before seeking recovery of the $14 million fee payment. But the Attorney General notes that the State Auditor launched an investigation into the settlement less than *1290 two months after the State memorialized the Settlement Agreement with MCI. The Auditor released an initial audit draft report in October 2005, a second draft report in November 2005, and a third in September 2006-the latter being the first to question the legality of the fee payment. The third report was finalized in October 2006, and the Auditor demanded the Langston Firm repay the fee payment. The Lang-ston Firm refused the demand in April 2007 and sued the Auditor in New York Bankruptcy Court in September 2007. The Auditor filed this state-court suit in December 2007.
¶ 106. It is difficult to imagine how this undisputed course of conduct could constitute an “omission ... fairly evidencing an intention permanently to surrender the right....” The Auditor began to investigate almost immediately, and he has actively pursued the case to this point. Because neither Langston nor the circuit court cited any authority for the proposition that waiver can be implied in this situation, we reverse the circuit court and hold that the State Auditor did not waive his right to proceed under Section 7-7-211(g).
CONCLUSION
¶ 107. The plain language of Section 7-5-7 mandates that outside counsel retained by the Attorney General be paid only from the Attorney General’s “contingent fund,” or from funds appropriated to the Attorney General by the Legislature. This Court so held in Pursue Energy.[54] But the parties bypassed the State treasury by agreeing that MCI would send part of its tax payment directly to the lawyers to pay attorney fees.
¶ 108. Because the $14 million Lang-ston received was part of MCI’s payment of its tax obligations, that money constitutes “public funds” for the purposes of the Auditor’s statutory authority to recover misappropriated public funds. Article Four, Section 100, of the Mississippi Constitution requires that those funds be deposited in the proper public treasury.
¶ 109. And neither the Attorney General nor the Langston Firm provided sufficient evidence to establish that the Auditor waived the State’s claim to the funds. We therefore reverse the circuit court’s judgment and remand this matter for disposition consistent with this opinion.
¶110. REVERSED AND REMANDED.
WALLER, C.J., RANDOLPH, LAMAR AND PIERCE, JJ., CONCUR. PIERCE, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., DICKINSON, P.J., RANDOLPH AND LAMAR, JJ. KING, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS AND CHANDLER, JJ. CARLSON, P.J., NOT PARTICIPATING.

. Miss.Code Ann. § 7-5-7 (Rev. 2002).

. Miss. Const, art. 4, § 100 (1890).

. Langston Law Firm v. Mississippi, 410 B.R. 150, 153 (S.D.N.Y.2008).

. Id. at 157.

. Miss.Code Ann. § 7-5-7 (Rev. 2002).

. Franklin v. Franklin, 858 So.2d 110, 115 (Miss.2003).

. Arceo v. Tolliver, 19 So.3d 67, 70 (Miss.2009) (citing Powe v. Byrd, 892 So.2d 223, 227 (Miss.2004)) (questions of law); Sheppard v. Miss. State Highway Patrol, 693 So.2d 1326, 1328 (Miss.1997) (statutory interpretation).

. See, e.g., B.C. Rogers Poultry, Inc. v. Wedgeworth, 911 So.2d 483, 490 (Miss.2005) (“the parol evidence rule ... precludes the enforcement of inconsistent or prior agreements in a finalized contract”).

. Collins v. Schneider, 187 Miss. 1, 192 So. 20, 22 (1939).

. Halsell v. Turner, 84 Miss. 432, 36 So. 531 (1904) (holding attorney has a lien on client funds in attorney's possession).

. Quoting the definition of “public funds” from Section 7-7-1.

. See, e.g,, Robinson Prop. Group, Ltd. P'ship v. McCalman, 51 So.3d 946, 953 (Miss.2011) (citing Read v. So. Pine Elec. Power Ass'n, 515 So.2d 916, 921 (Miss.1987); Burk v. State, 506 So.2d 993 (Miss.1987); Simpson v. State, 497 So.2d 424 (Miss.1986); Bonderer v. Robinson, 502 So.2d 314 (Miss.1986)).

. Black’s Law Dictionary 767 (abr. 8th ed. 2004).

. Miss. R. Prof'l Conduct 1.15.

. Miss.Code Ann. § 7-5-7 (Rev. 2002).

. Id. (emphasis added).

.Miss.Code Ann. § 27-75-15 (Rev. 2010) (emphasis added).

. Miss. Const, art. 4, § 100 (emphasis added).

. Pan Am. Petroleum Corp. v. Gully, 179 Miss. 847, 175 So. 185, 189 (1937).

. Robertson v. Weston Lumber Co., 124 Miss. 606, 87 So. 120, 124 (1921).

. Adams v. Fragiacomo, 71 Miss. 417, 15 So. 798, 800 (1893).

. Black’s Law Dictionary (1910).

. 1892 Miss. Laws ch. 126, § 4199, 922.

. Hood ex rel. State Tobacco Litigation, 958 So.2d 790, 812 (Miss.2007).

. Id. (quoting City of Belmont v. Miss. State Tax Comm’n, 860 So.2d 289, 306-07 (Miss.2003) (citing Colbert v. State, 86 Miss. 769, 39 So. 65, 66 (1905))).

. Robertson v. Miller, 144 Miss. 614, 109 So. 900 (1926).

. Emphasis added by the Attorney General.

. (Emphasis added.)

. Miss.Code Ann. § 7-7-1 (Rev. 2002).

. 7 Am. Jur.2d Attorney General § 5 (2007) (citing State ex rel. Nixon v. American Tobacco Co., Inc., 34 S.W.3d 122 (Mo.2000)).

. Mo. Ann. Stat. § 27.020(3) (West 2000) (emphasis added).

. Miss.Code Ann. § 7-5-7 (emphasis added).

. People v. Philip Morris, 198 Ill.2d 87, 259 Ill.Dec. 845, 759 N.E.2d 906, 914 (2001).

. 770 Ill. Comp. Stat. Ann. 5-1 (West 1998).

. Miss.Code Ann. § 7-5-7.

. Conant v. Robins, Kaplan, Miller & Ciresi, L.L.P., 603 N.W.2d 143, 148 (Minn.Ct.App.1999).

. Philip Morris Inc. v. Glendening, 349 Md. 660, 709 A.2d 1230, 1240 (1998).

. State v. Hagerty, 580 N.W.2d 139 (N.D.1998).

. Id. at 148.

. Id. at 146 n. 1 (citing N.D. Cent.Code § 54-12-08).

. In re Hood, 958 So.2d 790 (Miss.2007).

. Pursue Energy Corp. v. Miss. State Tax Comm'n, 816 So.2d 385 (Miss.2002).

. Id. at 386-87.

. Id. at 387.

. Id. (emphasis added).

. Id. at 391.

. Id. at 392.

. Id. at 390 (emphasis added).

. Miss.Code Ann. § 7-5-5 (emphasis added).

. Miss.Code Ann. § 7-5-7.

. Pursue Energy, 816 So.2d at 390 (emphasis added).

. Miss. Const, art. 4, § 100.

. Titan Indent. Co. v. Hood, 895 So.2d 138, 150-51 (Miss.2004) (emphasis added).

. Pursue Energy, 816 So.2d at 390.